**Donald V. DONOHUE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 6–71349.

United States District Court, E. D. Michigan, S. D.

June 2, 1978.

Alan C. Harnisch, Norman D. Orr, Kemp, Klein, Endelman & Ralls, P. C., Southfield, Mich., for plaintiff.

Robert E. Richardson, U. S. Dept. of Justice, Civ. Div., Washington, D. C., for defendant.

## OPINION

FEIKENS, District Judge.

Plaintiff is a qualified mortgage banker possessing special expertise in the field of obtaining residential mortgage insurance for third parties through the United States Department of Housing and Urban Development (HUD), and in particular, the Federal Housing Authority (FHA). He brings this suit against the United States under the Federal Tort Claims Act, alleging that certain federal employees negligently failed to follow proper administrative procedures before suspending him from doing business with HUD and FHA and he contends that this negligence caused him substantial damage.

From October 1961 through May 1974 plaintiff was employed at Advance Mortgage Company (Advance) in Detroit. He became manager of the Advance Origination Office in March 1965 and remained in that position until May 19, 1974 when he voluntarily terminated his employment.

Plaintiff left Advance in part because of his dissatisfaction with the compensation program instituted by new management and in part because he decided to move to Arizona.

When plaintiff discovered that Graham Mortgage Company (Graham) was opening a branch office in Phoenix, Arizona, he contacted Richard Graham, president of the company, and was hired almost immediately as manager of its new Phoenix office. He began working at Graham in August 1974 at a base salary of $15,000 plus fringe benefits and an opportunity to participate in an incentive program through which plaintiff could be paid an annual bonus calculated on the basis of profits realized at Graham.

On November 4, 1974 plaintiff was indicted by a federal grand jury in the Eastern District of Michigan for a claimed violation of 18 U.S.C. § 1010 and § 2(b). Specifically, the indictment charged in three counts that plaintiff had wilfully and knowingly filed false statements with HUD on two applications for FHA mortgage insurance. Upon arraignment plaintiff pleaded not guilty.

On November 13, 1974 the Deputy Director of the HUD Regional Office in Phoenix, Donald J. Karl, notified plaintiff that in light of the indictment and "pending completion of the aforesaid action and such legal proceedings as may ensue, [plaintiff was] suspended from participation in the HUD/FHA programs." On November 18, 1974 the Detroit Regional Office of HUD, through Area Director Elmer C. Binford, informed plaintiff that, in light of the outstanding indictment, the Detroit office had issued an "Unsatisfactory Risk Determination" (URD) against him. An URD requires the issuing office to reject all applications for FHA mortgage insurance submitted by the named individual. On December 30, 1974 plaintiff was informed by the Washington, D. C. office of HUD, through the Acting Assistant Secretary, David M. deWilde, that he was temporarily suspended from all participation in HUD programs pending resolution of the matters charged in the indictment.

On May 5, 1975 the United States Attorney for the Eastern District of Michigan voluntarily dismissed the indictment against plaintiff. This dismissal was based upon evidence, supplied to the government by plaintiff, indicating that his signatures on the falsified HUD/FHA documents (form 2900s) had been forged. Plaintiff notified HUD of the dismissal of the indictment on May 12, 1975. The Washington office thereafter rescinded its suspension on August 15, 1975; the Phoenix office rescinded its suspension on September 12, 1975; and the Detroit office withdrew its URD on October 10, 1975.

When in November 1974 the HUD office in Phoenix began refusing to process any documents submitted by Graham over plaintiff's signature, plaintiff offered to resign as manager of that office. At first Richard Graham resisted the idea; however, when it became clear that plaintiff's suspension had become a serious problem to the Graham office, Richard Graham accepted plaintiff's resignation.

Since plaintiff was ineligible to participate in HUD/FHA programs following his suspension he was unable to find employment as a mortgage banker in the Phoenix area. After he had been reinstated plaintiff began seriously searching for employment in his chosen field. However, because he was candid in informing all prospective employers of the indictment, suspension, and reinstatement most employers were discouraged from hiring him.

Plaintiff finally obtained employment as a mortgage banker with the Fort Wayne Mortgage Company (Fort Wayne) of Phoenix. He began working there on March 1, 1976. His base salary at Fort Wayne was $20,000 per year and his responsibilities were very similar to those he had held at Advance. However, unlike Graham and Advance, Fort Wayne had no incentive program for compensating its employees and plaintiff thus was not able by personal initiative to increase his rate of pay. Plaintiff was unable to function satisfactorily at Fort Wayne and he was fired in November 1976.

Since that time plaintiff has sold real estate for Clements Realty Company for

which he is paid on a commission basis and has thereby earned $1,299.00 since 1977.

On June 28, 1976 plaintiff, while still unemployed, filed suit for the alleged deprivation of his constitutional rights. His original complaint named the United States and claimed in three counts that his license to participate in the HUD/FHA mortgage insurance program was a property and liberty interest protected by the Due Process Clause of the Fifth Amendment of which he was deprived. Plaintiff alleged that HUD had violated his due process rights by suspending his license without a hearing and had thereby caused him to lose both the ability and the opportunity to be meaningfully employed as a mortgage banker.

In response to the initial complaint, the United States moved for dismissal or, in the alternative, for summary judgment, contending that the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346, was plaintiff's exclusive remedy for the alleged violation of his constitutional rights, and that plaintiff's claim was barred under the FTCA for failure to exhaust administrative remedies, 28 U.S.C. § 2675(a), and in all other respects by sovereign immunity. After a hearing on defendant's motion, held on November 3, 1976, I deferred ruling and granted plaintiff leave to follow one or more of the following alternatives:

(1) To show why the United States should not be dismissed as a party defendant;

(2) To move to add additional parties or otherwise amend the complaint;

(3) To have the complaint dismissed without prejudice.

Subsequently, plaintiff filed administrative tort claims with all three HUD offices, which were in due course denied. Plaintiff then filed an amended complaint seeking damages against the United States under the FTCA for the negligent actions of its employees.

■ In order to prove his claim under FTCA, plaintiff must establish, by a preponderance of the evidence, that (1) a federal employee acted negligently, as that term is defined under the applicable local laws, 28 U.S.C. § 1346(b), and (2) that such conduct proximately caused the injury and damage of which plaintiff complains.

■ In order to prove the first element plaintiff offered the procedural regulations governing HUD employees at the time of his suspension, specifically 24 C.F.R. 24.10 and 24.11, claiming that since HUD officials violated these regulations they were negligent as a matter of law. In both Arizona and Washington, D. C. (the applicable jurisdictions here) a violation of a statutory or regulatory provision constitutes negligence *per se* provided the individual seeking damages falls within a class intended to be protected by the statute or regulation and the harm suffered was of the type designed to be prevented by the statute. See *Southern Pacific Transportation Co. v. Lueck*, 111 Ariz. 560, 535 P.2d 599 (1975); *Manhattan-Dickman Construction Co. v. Shawler*, 113 Ariz. 549, 558 P.2d 894 (1976); *HRH Construction Corporation v. Conroy*, 134 U.S. App.D.C. 7, 411 F.2d 722 (1969) and cases cited therein.

Part 24 of 24 C.F.R., which governed the Department of Housing and Urban Development at the time of plaintiff's suspension provided in part:

§ 24.11 Suspension.

Suspension is a drastic action taken when there is suspicion or fraud or other criminal conduct in Government business or contractual dealings and, as such, shall not be based upon an unsupported accusation. A contractor or grantee is suspended pending investigation and appropriate action by the Department of Justice. In assessing whether adequate evidence exists for invoking a suspension, consideration shall be given to the amount of credible evidence which is available, to the existence or absence of corroboration as to important allegations, as well as to the inferences which may properly be drawn from the existence or absence of affirmative facts. This assessment shall include an examination of basic documents, such as contracts, inspection reports, and correspondence. A suspension may be modi-

fied whenever it is determined to be in the interest of the Government to do so.

Since plaintiff did not do business with the Detroit office of HUD, the issuance of an URD against him by that office did not harm his financial condition or injure him in any other compensable manner. Therefore, I will consider the validity of plaintiff's claims under the FTCA as they pertain to the actions of HUD officials in the Phoenix and Washington offices only.

▮▮ 24 C.F.R. 24.10 and 24.15(a)(5) establish procedures for notice, hearing and review for those cases in which HUD seeks to debar or suspend the license of an individual with whom it does business.[1] It is reasonable to believe, and I so find, that these regulations were designed to insure that persons such as plaintiff, who worked independently with HUD on a regular basis, would not lose portions of their incomes, or their livelihoods, because of a suspension or debarment issued without adequate procedural safeguards. I further find that plaintiff has established by a preponderance of the evidence that officials in the Washington and Phoenix offices suspended him from doing business with HUD without complying with these regulations. This

1. 24.15(a)(5) provided:
   The suspended party is entitled to request an opportunity to be heard and represented by counsel in accordance with § 24.10 of this part.
   24.10 provided in pertinent part:
   Procedural requirements relating to the imposition of debarment.
   (a) *Initiation of debarment action.* When the Department seeks to debar a contractor or grantee (or any affiliate thereof), that party shall be served with written notice by registered or certified mail, return receipt requested, from the program officer proposing the action: (1) Stating that debarment is being considered, (2) setting forth the reasons for the proposed debarment, and (3) indicating that such party will be accorded an opportunity for a hearing if he so requests within 10 days from his receipt of notice, and that he may be represented by counsel.
   (b) *Hearing request*—(1) *Request for hearing.* Any contractor or grantee that has been notified of a proposed action is entitled to request an opportunity to be heard and to be represented by counsel. A hearing request shall be made in writing addressed to the program officer proposing the action. If at the end of such 10-day period no request has been received, the officer may assume that an opportunity to be heard is not desired, and may proceed to make a final determination and so notify the interested party.
   (2) *Hearing; time and place.* Upon receipt of a request for an opportunity to be heard, the program officer shall arrange a timely hearing. Notice of the time and place of such hearing shall be in writing, transmitted by registered or certified mail, return receipt requested, and shall include a statement indicating the informal nature of the proceedings and their purpose. It shall be within the discretion of the appropriate Assistant Secretary to determine the hearing place.
   (3) *Determination.* Hearings shall be conducted by a Hearing Officer of the Department who shall be responsible for the fair and expeditious conduct of proceedings. The program office shall be represented by the General Counsel or his designee. A record shall be made of the proceeding and shall be made available to the parties upon request. After the contractor or grantee against whom action is proposed has been afforded an opportunity to be heard, the Hearing Officer shall make an initial written determination on the evidence presented. The Hearing Officer's determination shall be final unless reversed or modified within 30 days by the appropriate Assistant Secretary. Each determination shall become a part of the record. Notice of the final determination shall be given in writing, signed by the Assistant Secretary, and transmitted by registered or certified mail, return receipt requested. The determination shall be conclusive.
   (4) *Rescission and reinstatement.* Any contractor or grantee debarred from the benefits of participation may in writing request reinstatement any time after 6 months from the date of the debarment determination. The procedures for reinstatement are substantially similar to those invoked in the initial proceedings. However, conduct of the proceedings shall be the responsibility of the program officer. His determination to reinstate shall be subject to the approval of the appropriate Assistant Secretary. In reaching his determination regarding reinstatement, the program officer must be satisfied that the original wrongful act has been righted and also be persuaded from the assurances of the party concerned that he understands the requirements of the statutes and the administrative rules and regulations and that he will comply with them in the future. When a debarment has been rescinded, a report thereof shall be forwarded by the program officer to the Director, Office of Investigation, who shall forward notice of reinstatement to the party so reinstated.

finding is based upon the following evidence:

On November 8, 1974, shortly after plaintiff had become aware of the indictment, he visited the Phoenix Regional Office of HUD. Plaintiff, accompanied by his employer, Richard Graham, spoke with Donald J. Karl, Deputy Director of the Phoenix office, and John Weideman, attorney-advisor for that office. The men briefly discussed the indictment and both plaintiff and Graham steadfastly maintained that plaintiff was innocent of the offense charged. Karl told plaintiff that he would study the matter in order to determine an appropriate course of action.

Without further investigation, and based upon the existence of the indictment only, Weideman recommended to Karl that plaintiff be suspended from conducting any business with the Phoenix office. Karl accepted Weideman's recommendation and notified plaintiff on November 13, 1974 that he was suspended from doing business with the Phoenix office. The letter also informed plaintiff of his right to a hearing under 24 C.F.R. 24.10. Plaintiff did request "a hearing and meeting" in a letter to Weideman dated November 18, 1974. After the hearing date had been set, however, Weideman informed plaintiff by telephone that such a hearing would serve no useful purpose. Weideman stated that in his opinion the criminal prosecution would have to "run its course" before a meaningful hearing on reinstatement could be held. Since plaintiff maintained that he still wished to present his side of the story, Weideman agreed to meet informally with him on December 10, 1974.

■ On that date plaintiff met again with Karl and Weideman. Plaintiff took with him several papers from the files at Advance and presented them to Karl and Weideman for their inspection. They refused to examine these papers and told him to give them to his attorney, if he had one, in order to defend himself in the pending criminal case. Still protesting his innocence, plaintiff left the Phoenix office.[2]

Plaintiff received similar treatment from HUD officials in Washington, D.C. On December 30, 1974 David M. deWilde, Acting Assistant Secretary of HUD, informed plaintiff that he was suspended from doing business with HUD "pending resolution of the subject matter of the indictment." The letter also informed plaintiff of his right to a hearing pursuant to 24 C.F.R. 24.10. On January 8, 1975 plaintiff sent a letter to deWilde requesting an "immediate hearing." Subsequently, a hearing was scheduled for March 4, 1975, and Michael F. Burke was appointed hearing officer. In a letter dated February 11, 1975, Burke informed plaintiff that John P. Witsil would represent the department at the hearing. The letter listed Witsil's telephone number and instructed plaintiff to call if he had any questions. Plaintiff called Witsil some time in February 1975.

While Witsil testified that in this telephone conversation he informed plaintiff that in past cases an indictment had always been found to be a basis to sustain a suspension, plaintiff testified, and I so find, that Witsil told him that at the hearing the indictment would be presented and nothing else could be done. Plaintiff accordingly decided not to go to Washington to attend such a meaningless "hearing."

Witsil freely admitted at trial that he never investigated the validity of the charges against plaintiff and never examined the HUD file on plaintiff, even though it was readily available to him. In fact, Witsil never even saw a copy of the indictment returned against plaintiff. Although he was to represent the Department at plaintiff's hearing and was thus charged with establishing the propriety of plaintiff's continued suspension, he fully expected to discharge this duty by merely presenting

2. Defendant argues that since 24 C.F.R. 24.12 authorizes suspension by Assistant Secretaries only, Deputy Director Karl had no authority to suspend plaintiff. Defendant asks me to conclude from this that Karl in fact issued the equivalent of an Unsatisfactory Risk Determination (URD) against plaintiff rather than a suspension and that his actions as such were proper even without an investigation or hearing. This argument is without merit.

the indictment, citing the regulations and resting his case.

Defendant argues that plaintiff was offered a hearing by both the Phoenix and Washington offices but decided voluntarily to relinquish this right. I cannot accept this as an adequate defense. Both Weideman and Witsil intentionally gave plaintiff the impression that any hearing, if conducted before the termination of the criminal case, would be an empty formality.

If the positions taken by Weideman and Witsil are an accurate account of the type of hearing routinely offered by HUD to persons in plaintiff's situation, Karl, Weideman, Witsil and their colleagues were grossly negligent in not following the regulations governing HUD. The type of hearing offered to plaintiff by Weideman and Witsil bears no resemblance to that required by 24 C.F.R. 24.10.

■ 24 C.F.R. 24.11 additionally requires that all documents and evidence be fully examined before suspending an individual. Therefore, Karl, Weideman and Witsil were also negligent in not investigating the basic documents in plaintiff's case, chiefly the form 2900s upon which plaintiff's indictment was based.[3] This finding is supported by the testimony of John Weichman, Chief of the Participation Control Branch of HUD:

THE COURT: Tell me in your own words, based on your experience what would have happened at such a hearing.

A. What would have happened, in my experience, is that the departmental counsel assigned to represent the program officials, after reviewing the indictment would have made arrangements with the office of the Inspector General to review the investigative file, so that he could relate and familiarize himself with all pertinent aspects of the investigative file. In this case, since the key documents underlying the indictment is the 2900 Form, I am quite certain that certainly a copy of it would have been in that investigative file.

*Tr.* 421, 422

Witsil was negligent in a further respect. On May 11, 1975 plaintiff sent Witsil a photocopy of the government's dismissal of the indictment. On May 12, 1975 plaintiff forwarded another such copy to Michael Burke and requested reinstatement. Burke answered plaintiff in a letter dated May 19, 1975: "I have forwarded your letter, together with a copy of the Notice of Dismissal to appropriate departmental personnel for any administrative action being deemed necessary." A copy of this letter was then sent to Witsil. On May 30, 1975 Witsil telephoned John P. Conley, the Assistant

---

**3.** In failing to study plaintiff's case Karl also failed to comply with the following provisions of the HUD Handbook:

2-1. GENERAL. In determining whether administrative action should be taken, and the nature of such action, the Field Office-Director must be fully conversant with all of the facts in the case and should exercise his own judgment, as distinguished from merely approving the recommendations of an assistant. The action taken should be directed to protecting the Department and the public from future abuse and to accomplishing correction of the conditions giving rise to the action. In some cases it may be sufficient to warn the subject against future abuse, in others it may be necessary to refuse to accept applications until corrective action is taken, and in serious cases it may be necessary to debar the persons or organizations involved from participating in any HUD–FHA program for a specific period of time.

\* \* \* \* \* \*

b. Because of the serious economic consequences that may result from refusal to accept applications or their exclusion from HUD–FHA programs the Field Office Director's action must be based on acceptable proof.

3.1 REFERRAL FOR INVESTIGATION. When the Field Office Director has full and complete information so that he can make a determination regarding administrative action he need not refer the matter for further investigation. However, the following must be investigated: all matters which may involve a violation of criminal statutes, all allegations of misconduct on the part of a HUD employee and all allegations of violations and irregularities where all of the circumstances are not known.

These provisions establish a duty of due care, the breach of which is evidence of negligence. *Gill v. United States*, 429 F.2d 1072 (5th Cir. 1970); *Ingham v. Eastern Airlines*, 373 F.2d 227 (2d Cir. 1962).

U.S. Attorney assigned to plaintiff's criminal case, to determine the basis for the dismissal. Conley told Witsil that the document upon which plaintiff's indictment was based had in fact not been signed or submitted by plaintiff. In spite of this information clearing plaintiff of any wrongdoing upon which continued suspension could be justified, and in spite of personal reminders by plaintiff, Witsil inexplicably waited until July 21, 1975 to move for dismissal of the suspension. It was not until August 1, 1975 that David deWilde finally lifted plaintiff's suspension. This delay is directly attributable to Witsil's negligence. Although Witsil attempted to explain the delay by stating that he was in Chicago for some time in July 1975 and that he was required to wait for written verification from the U.S. Attorney's office regarding the reasons for the dismissal of the indictment before moving to lift the suspension, neither of these reasons justifies the lengthy delay. This is especially true in light of the fact that Witsil finally moved for dismissal of the suspension without ever receiving written verification from the U.S. Attorney's office.

■■ Defendant contends that it is free from liability in that its officials or employees acted with due care or pursuant to a discretionary function in dealing with plaintiff's case. As the above discussion indicates, HUD officials did not act with due care in suspending plaintiff. In addition, the discretionary function exemption, 28 U.S.C. § 2680(a), does not free the United States from liability for the actions of its officials or employees unless they are acting on a policy making level or exercising executive options. This exemption does not apply where, as here, government officials are acting under the provisions of a mandatory regulation. *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *Downs v. United States*, 522 F.2d 990 (6th Cir. 1975); *Griffin v. United States*, 500 F.2d 1059 (3rd Cir. 1974). Defendant's arguments in this regard, therefore, must fail.

I further find that the negligent actions of Karl, Weideman and Witsil proximately caused the damage suffered by plaintiff.

Had these HUD officials in Phoenix and Washington examined the basic documents in plaintiff's case, adequately prepared for and held a full hearing, it is more likely than not that they would have decided to promptly rescind plaintiff's suspension thus avoiding his loss of employment. As such, the negligence committed by these HUD officials was a "substantial cause" of plaintiff's damages, *Delta Air Lines, Inc. v. United States*, 561 F.2d 381 (1st Cir. 1977), for which he may recover.

I find that plaintiff suffered damages in the following amounts. From November 18, 1974 through March 1, 1976, a period of 66 weeks, plaintiff lost $28,942 in wages. This figure is based upon a potential weekly salary of $395 per week from November 18, 1974 to December 31, 1976 and $754 per week from January 1, 1976 to March 1, 1976. These are the amounts earned by plaintiff's successor at Graham during those periods as shown on his annual wage and tax statement and bonus notices. I find that plaintiff would have earned approximately the amount his successor earned since plaintiff was experienced and successful as a mortgage banker and Graham Mortgage was a young, expanding company. From March 1, 1976 through November 18, 1976, a period of 34 weeks, plaintiff earned $15,846 at Fort Wayne Mortgage. His successor at Graham earned $25,636 for the same period. Plaintiff, therefore, may recover the difference between the two figures, $9,790.

The evidence indicated that the indictment, suspension and delayed reinstatement caused plaintiff's inability to function effectively at Fort Wayne. From the time he began work there plaintiff experienced serious difficulties. He became highly distrustful of his clients and unable to work comfortably with his colleagues. According to plaintiff he lacked the ambition and drive needed to be a successful mortgage banker. He tended to become immobilized by details. All of these feelings were new to plaintiff who before the issuance of the indictment had been an ambitious, reliable and personable employee. His reputation

in the mortgage banking community was excellent and, at Advance, his expertise contributed a great deal toward the financial success and expansion of that company. At Fort Wayne, however, plaintiff was unable to perform satisfactorily and finally was dismissed.

On the basis of this evidence I find that plaintiff is entitled to recover damages for a reasonable period of time following his dismissal from Fort Wayne and I find a reasonable time for plaintiff to find suitable employment is one additional year. From November 18, 1976 through November 18, 1977 plaintiff's successor at Graham earned $55,538 and thus I find plaintiff is entitled to recover this amount less $1,299 he earned at Clements Realty, or $54,239.

Plaintiff is also allowed to recover the amount he expended replacing the health insurance benefits formerly provided to him by his employer. Plaintiff testified that he paid $74 per month for health insurance from the time he left Graham until he began working at Fort Wayne. Thus, he paid $111 in 1974, $888 in 1975 and $148 in 1976, or a total of $1147 for health insurance before March 1, 1976. While plaintiff was employed at Fort Wayne, from March 1 to November 18, 1976, he spent nothing on health insurance since Fort Wayne furnished a policy for him and his family. However, from November 18, 1976 to November 18, 1977, when plaintiff's right to recovery ends, plaintiff spent $85 per month for health insurance or $935. Therefore, he may recover a total of $2,082 to compensate him for lost health insurance benefits. Since plaintiff did not spend any amount to replace other lost fringe benefits, such as life or disability insurance, he cannot recover any amount for the loss of these benefits. Thus, defendant is liable to plaintiff for a total of $95,053 together with interest and costs, 28 U.S.C. §§ 2411 and 2412.

Plaintiff claims out-of-pocket expenses of $24,185.17 and miscellaneous expenses of $250.00. The interest on loans which plaintiff made, several by mortgages, are not allowed as recoverable items. Plaintiff is obtaining full recovery for lost earnings during the period in which the loans were made and he has had the use of these loan funds. To permit him to recover the interest amounts paid on these loans would allow him a double recovery.

The $250.00 claimed by plaintiff for miscellaneous expenses is likewise denied.

■ I also decline to give plaintiff the further claimed permanent damages he seeks. At trial plaintiff failed to produce any medical or psychiatric evidence to support a finding that he is permanently unemployable. I also find that under Arizona and Washington, D.C. law plaintiff cannot recover for his emotional damages, if any, since defendant has not committed an intentional tort against him or physically injured him in such a manner as to cause incidental or consequential emotional harm. See *Olivas v. United States*, 506 F.2d 1158 (9th Cir. 1974); *Perry v. Capital Traction Co.*, 59 App.D.C. 42, 32 F.2d 938 (1929), cert. denied, 280 U.S. 577, 50 S.Ct. 31, 74 L.Ed. 627 (1929); *Brown v. Potomac Electric Power Co.*, 236 F.Supp. 815 (D.C.1964).

Judgment is accordingly entered for the plaintiff and against the defendant in the amount of $95,053, plus interest and costs.