**Robert D. ADAM, et al., Appellees,**

v.

**STATE of Iowa, Appellant.**

No. 84-950.

Supreme Court of Iowa.

Jan. 15, 1986.

Thomas J. Miller, Atty. Gen., Brent R. Appel, Deputy Atty. Gen., John R. Scott, Sp. Asst. Atty. Gen., and Catherine L. Winslow, Asst. Atty. Gen., for appellant.

James P. Hoffman, Keokuk, and James Walker, Bloomington, Ill., for appellees.

UHLENHOPP, Justice.

This appeal involves the State's challenge to judgments of the district court holding the State liable for damages resulting from negligent licensing and inspecting of a grain elevator by the Iowa State Commerce Commission (ICC).

Plaintiffs are grain producers who sold grain to and stored grain with Prairie Grain Company, a corporation located in Stockport, Iowa. Prairie Grain was a licensed grain dealer and warehouse for agricultural products pursuant to chapters 542 and 543 of the Iowa Codes of 1975 and following. ICC was charged with adminis-

tering the provisions of those chapters including licensing and inspecting grain dealers and grain warehouses.

ICC received reports that Prairie Grain was issuing insufficient funds checks. On January 31, 1980, ICC conducted a special investigation in response. On the same date Raymond Keller, the elevator's principal operating officer, committed suicide. An in-depth investigation of Prairie Grain disclosed substantial shortages of grain inventory. Bankruptcy proceedings were instituted shortly. Plaintiffs lost heavily on account of their grain stored at the facility.

The trial court found that the special investigation disclosed: "[Prairie Grain] underreported its obligations in 1975 by at least 39,000 bushels of corn and at least 67,000 bushels of soybeans. In April, 1979, Prairie Grain underreported its obligations by at least 341,000 bushels of corn, and at least 258,000 bushels of soybeans. By February, 1980, Prairie Grain had shortages of at least 1,338,000 bushels of corn and 588,-000 bushels of soybeans."

Plaintiffs filed suit on August 21, 1980. In all, nine defendants were called to answer for their part in Prairie Grain's failure and plaintiffs' losses. The present appeal is one of several to reach this court arising out of the losses. One of the prior appeals was an interlocutory challenge by the State from the district court's denial of summary judgment in this litigation, *Adam v. Mt. Pleasant Bank & Trust Co.*, 340 N.W.2d 251 (Iowa 1983). In that appeal we rejected the State's assertion that it was immune from suit under the "misrepresentation" exception in section 25A.14(4) of the tort claims act.

Plaintiffs' claims against the State were tried to the court beginning March 20, 1984. A claim of willful and wanton misconduct authorizing punitive damages was withdrawn from consideration at the close of the plaintiffs' evidence, pursuant to section 25A.4 of the Code. In the remaining negligence claim plaintiffs alleged ICC breached several duties owed them and thereby proximately caused their losses. These breaches included negligent failure to inspect as often as required, negligent inspections, and negligent failure to adopt rules.

We of course view the evidence in the light most favorable to the judgment for plaintiffs. *RET Corp. v. Frank Paxton Co.*, 329 N.W.2d 416, 419 (Iowa 1983).

As found by the trial court, the purpose of chapters 542 and 543 of the Code is "to protect grain producers who sell grain to or deposit grain at Iowa grain elevators." As the court also found, grain regulatory officials including ICC have known for years that the usual sequence of events preceding financial failure of an elevator is

for the elevator to get into cash flow problems due to commodity speculation losses or some other reason, to sell depositor's grain in order to meet cash obligations, and to repeat this sequence until financial collapse. Usually a number of years pass.... [D]uring this time elevator management underreports its grain obligations to the Iowa Commerce Commission.

. . .

Underreporting of grain obligations has been a major method used by elevator management to avoid detection by examination officials in those elevator failures that have involved the largest number of producers.

Prairie Grain's failure fit this pattern.

The trial court made several findings of fact concerning ICC's inspections of Prairie Grain. ICC employed only one examination procedure to detect underreporting, "Grain Records Audit Step No. 12". As the trial court found, "That step requires the examiner to select at random eight different scale tickets from the numerical file of those scale tickets issued since the date of the last examination. The examiner must then check to see if the delivery of grain reflected by that scale ticket had been recorded on a customer account." The examiner must select the tickets to avoid manipulation by elevator management.

The court found that in 1977 the ICC examiner was at Prairie Grain on July 21st through the 26th. Of eight scale tickets selected for examination, two were dated July 22, 1977, one was dated June 1, two were dated May 31, two were dated May 6, and one was dated January 18. The examiner testified he personally selected these scale tickets.

In 1978 the examiner arrived June 15, 1978, and departed June 20. He did not himself select the scale tickets, and only seven scale tickets were selected. Of these tickets selected by elevator personnel—allegedly selected at random—four were dated June 16 which was one day after the examination started, two were dated June 14, and one was dated June 12.

In 1979 the examination involved seven scale tickets. What was to be a random selection of scale tickets for an entire year resulted in a sampling of tickets from the months of February, March, and April.

Based on the testimony of the secretary at Prairie Grain, the trial court found that "none of the Iowa Commerce Commission examiners who were at Prairie Grain in 1977, 1978, or 1979 made a random selection of the scale tickets for step 12 from the numerical file of scale tickets issued since the last examination." The court also found that the tickets were selected and tendered by Raymond Keller rather than the ICC examiners. An ICC employee's subsequent retrospective study of the sale tickets previously examined showed that the examiners failed to conduct additional investigations despite obvious inadequacies in customer account records. Further, "[i]t would not have been possible to conduct a proper warehouse examination and not have noticed the fabrication of the Daily Position Records."

ICC also failed to check adequately the financial statements of Prairie Grain, as the assets did not equal the liabilities and the listings of assets did not correspond with financial analysis summary sheets. These financial statements were prepared by Prairie Grain employees. ICC provided no explanation for how its examiners found the financial statements acceptable. As found by the trial court, "The evidence shows that grain regulatory officials ... had known for more than ten years before the financial failure of Prairie Grain that financial statements prepared by the licensed applicant were inferior, in terms of providing the agency with credible financial data regarding the license, to C.P.A. audited financial statements."

Despite ICC's practice of conducting special examinations of grain warehouses when information regarding financial problems was received, it failed to follow this practice in September 1979 when it received a call concerning rumors of financial problems and grain shortages at Prairie Grain. The head of the grain warehouse division explained to the caller that he had not heard of such information and that the latest examination in April 1979 did not disclose any problems. Nothing more was done in response to the call. He did however testify that he was aware ICC examiners were not adequately trained or qualified to carry out investigation procedures.

After trial the court held for the producers in the respective sums they had lost (less the amounts they received from the bankruptcy trustee) together with interest from entry of judgment and costs. The State appealed asserting several propositions.

I. *Exemption sections 542.14 and 543.-38.* Section 542.14 of the grain dealer's act and section 543.38 of the warehouse act provide:

> Nothing in this chapter shall be construed to imply any guarantee or obligation on the part of the state of Iowa, or any of its agencies, employees or officials, either elective or appointive, in respect to any agreement or undertaking to which the provisions of this chapter relate.

The State contends that these provisions are liability disclaimers and reinstate the State's immunity with regard to negligence claims under chapters 542 and 543. The trial court found that this language

relates to the agreements and undertaking which the Commission was authorized to enter into such as those provided for specifically in Section 543.2 of the Code [contracts with federal government regarding inspections].... [T]he very words "guarantee obligation, agreement and undertaking" are all the language of contract and not of tort. The Court finds that the legislature did not intend to alter the State's tort liability for the Commission's negligence under the Iowa Tort Claims Act by inserting the above language in the Grain Dealer and Warehouse Act.

This court, however, is the final arbiter of the meaning of these provisions. *American States Insurance Co. v. Estate of Tollari*, 362 N.W.2d 519, 521 (Iowa 1985). We are not bound by a trial court's statutory construction, as such construction presents a question of law. *Asmann v. Board of Trustees*, 345 N.W.2d 136, 138 (Iowa 1984). Our goal here is to determine the legislature's intent in enacting sections 542.14 and 543.38. *See Hansen v. State*, 298 N.W.2d 263, 265 (Iowa 1980).

Plaintiffs urge that the legislative intent was to protect the State from liability relating to contractual obligations. They base their interpretation of sections 542.14 and 543.38 on the words "guarantee", "obligation", "agreement", and "undertaking", arguing as the trial court concluded that these are words of contract rather than tort.

The words are clearly not unique, however, to the language of contract. The State invites our attention to a multitude of circumstances in which these words are used in a tort context.

Plaintiffs also rely on section 4.1(19) of the Code defining "undertaking" as "a promise or security in any form." Read in context, however, this definition applies when the term is used in a documentary sense.

To determine legislative intent in each of the two sections we must consider the entire act and attempt to harmonize these sections with the rest of the two acts respectively. *Matter of Estate of Bliven*, 236 N.W.2d 366, 369 (Iowa 1975). The only contractual reference found and relied on by plaintiffs in chapter 543 is contained in section 543.2:

> The commission may make available to the United States government, or any of its agencies, including the commodity credit corporation, the results of inspections made and inspection reports submitted to it by employees of the commission, ... The commission may enter into contracts and agreements for such purpose and shall keep a record of all money thus received.

The grain dealer's act, chapter 542, contains no corresponding provision at all. As to that act, therefore, plaintiffs are unable to justify their contractual interpretation of the exemption section.

The State argues that no basis exists even under chapter 543 to connect the exemption section with the federal government contract provision in section 543.2. It contends that the language of sections 542.14 and 543.38 referring to "any agreement or undertaking to which the *provisions* of this chapter relate" is not limited to an isolated provision, but is much broader in scope.

Viewing the two chapters in their entirety, we think the most reliable indicator of the legislature's objective in the exemption sections lies in the following words from the sections which we have emphasized: "in respect of any agreement or undertaking *to which the provisions of this chapter relate*." What are the agreements and undertakings to which the two chapters relate?

The basic purpose of chapter 542 is protection of persons who deal with grain dealers, to make as certain as reasonably possible that those persons get their money for their grain. The sections of chapter 542 are directed to the end of making agreements and undertakings of grain dealers reliable. Section 542.2 gives ICC "general supervision over the business operations of grain dealers." Section 542.3 requires a

grain dealer to obtain a license, specifies the contents of a license application, and requires a specified net worth of the applicant and a financial statement. Section 542.4 requires that the dealer post a bond "conditioned that the applicant will pay the purchase price of any grain to the producer...." Section 542.9 has to do with inspection of grain dealers by ICC. Section 542.15 regulates credit purchases by dealers. The other sections of the chapter fill in the details. Thus the *agreements and undertakings by grain dealers with customers* appear to be the agreements and undertakings to which the provisions of chapter 542 relate. The same rationale applies to chapter 543 relating to warehouses.

■ The evident purpose of the General Assembly in enacting the exemption sections was to make certain that the State made no guarantee of and had no obligation on the agreements and undertakings of grain dealers and grain warehouses which the chapters seek to make reliable and to which the two chapters relate, including dealer and warehouse bonds. Those are the agreements and undertakings of Prairie Grain for grain purchased and grain stored which are in default in this case (except for its bonds, which were not in default). By virtue of the exemption sections, and other things being equal, the State has no liability on such of those agreements and undertakings as were made when the exemption sections were respectively in force. If we held that plaintiffs could nonetheless recover for tort as to those losses, plaintiffs could accomplish by indirection what they cannot accomplish directly.

II. *Effect of exemption sections.* We next consider the specific effect of this holding on plaintiffs' claims.

■ A. Issue preclusion. Plaintiffs argue that the effect of sections 542.14 and 543.38 was established in favor of producers by the district court in *Jannings v. State* (Van Buren County No. 22631).

The *Jannings* court considered the same issue and the issue arose out of the same financial failure of Prairie Grain. In that case the district court overruled the State's motion to dismiss based on the exemption sections. A motion for summary judgment by the State met the same fate.

We granted interlocutory appeal from those rulings. During the pendency of that appeal the parties to that case settled it. The settlement document contained this clause:

> This release and indemnity agreement is executed as a compromise settlement of disputed claims, liability for which is expressly denied by the parties released, and the payment of the above sums does not constitute an admission of liability on the part of any persons or entity.

We hold that the disposition of the *Jannings* case does not preclude the State from relying on the exemption sections in the present case. A requirement of issue preclusion is a final prior judgment. Restatement (Second) of Judgments § 13 (1982). *See Catlin v. United States,* 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed.2d 911 (1945). The district court denied the State's motions in *Jannings,* but we granted an appeal and the parties then settled the case under a denial, and without an admission of, the State's liability. Undoubtedly the State would have gone through with the appeal but for the settlement. Under those facts the prior orders of the district court became a nullity by action of the parties themselves.

■ B. Scope of exemption. The evidence of ICC's negligence dates from 1975 through 1980. Section 543.38 of the warehouse Act was enacted in 1967. Plaintiffs' claims under that act are therefore completely foreclosed.

■ The exemption section in the grain dealer's act, however, was not effective until July 1, 1978. 1978 Iowa Acts ch. 1044, § 12. The State first urges that this exemption applies retrospectively. It contends the section is merely a rule of construction reinforcing legislative intent that no private cause of action is created by the acts. We think however that without the

section the State would not have been exempt from liability. The section is more than a mere clarifying rule of construction.

We recently construed a similar amendment in *Pfiffner v. Roth*, 379 N.W.2d 357 (1985). We there found an amendment exempting cities from the Iowa competition law was substantive. In the course of our opinion we stated: "As a general observation, a change such as this, which provided for an exemption where none existed before, would have to be considered a substantive change. In interpreting such an amendment to a statute, there is a presumption of a change in legal rights." *Id.* at 359.

Moreover, the 1978 act creating the exemption in chapter 542 contains no language or indication that the amendment is to be given retrospective effect. Hence the amendment is presumed to be prospective only. Iowa Code § 4.5.

In holding section 542.14 is to be applied prospectively only, we leave open a window of liability as to the damages, if any, which plaintiffs prove accrued prior to July 1, 1978, from ICC's negligence under chapter 542. We thus proceed to several other issues as they may relate to any losses which accrued prior to July 1, 1978.

III. *Substantive basis of State's liability.* The State challenges the basic holding of liability on its part. The trial court concluded the State was negligent prior to July 1, 1978, in the following respects:

(a) It failed, during the 1977 [and] 1978 ... examinations to randomly select scale tickets from the numerical file of scale tickets issued since the last examination;

(b) It failed, during the 1977 [and] 1978 ... examinations to verify what scale tickets had been issued since the last examination because the prior examination reports did not record the cutoff scale tickets for the series of scale tickets used for both corn and soybeans;

(c) It failed in the examinations of 1977 and 1978, ... to select the number of scale tickets which the testimony indicated should have been selected in the examination of an elevator of this size, and in 1978 ... selected less scale tickets than the minimum required by the procedures of the Commission;

(d) It used underqualified, undertrained and underpaid examiners to conduct the warehouse and grain dealer examinations;

(e) It failed to conduct further investigation when at least one of the scale tickets selected during step 12 of the grain records audits in each of 1977 [and] 1978 ... was for a delivery for which no adequate customer account record was available;

(f) It failed to correctly analyze the July, 1977, and June, 1978, financial statements submitted in support of the applications for license renewal; [and]

(h) It failed to request CPA audited financial statements in support of applications for renewal of license.

The court's findings base negligence of the State on both *failing* to perform statutory duties and *performing* statutory duties with lack of due care.

Prior to July 1, 1978, section 542.2 of the grain dealer chapter provided that ICC administer the chapter and adopt rules. In addition to general supervisory powers in section 542.2, the commission licensed grain dealers upon compliance with the terms and conditions of chapter 542 and the rules of ICC. § 542.5. Section 542.11 provided that a license was required in order to engage in the business of grain dealer. Section 542.9 provided that ICC may inspect grain dealers.

A prerequisite of negligence liability is a duty owed by the actor which requires conformity to a standard of conduct for the protection of the victim. *Wilson v. Nepstad*, 282 N.W.2d 664, 667 (Iowa 1979); W. Keeton, *Prosser and Keeton on Torts* § 30 (5th ed. 1984). We stated in *Lewis v. State*, 256 N.W.2d 181, 188 (Iowa 1977):

It is immaterial whether the standard is one imposed by the rule of common law requiring the exercise of ordinary

care not to injure another, or is imposed by a statute designed for the protection of others.

We look to the grain dealer act to determine if a duty was created. The act provides that ICC *shall* license dealers *in compliance with the act*, § 542.5, and *shall establish rules* necessary for the administration of the act. § 542.2 (emphasis added). These provisions create a duty on the part of ICC so to act. Iowa Code § 4.1(36)(a) ("shall" imposes a duty); *see Hildenbrand v. Cox,* 369 N.W.2d 411, 416 (Iowa 1985).

The State's duty is breached by its failure to perform these duties in the manner the statute requires. *National Carriers, Inc. v. United States,* 755 F.2d 675 (8th Cir.1985) (meat inspectors had nondiscretionary responsibility to carry out federal statutes and regulations to tag or condemn damaged meat, and federal government liable for losses where inspectors failed to comply); *Nearing v. Weaver,* 295 Or. 702, 670 P.2d 137 (1983) (failure to comply with statute mandating specific action by law enforcement officers creates liability); *Campbell v. City of Bellevue,* 85 Wash.2d 1, 530 P.2d 234 (1975) (Failure to obey statute resulted in city liability where city officer failed to sever connections in hazardous underwater wiring as required by statute. The State however could not be held liable because of statute specifically providing immunity for negligent inspection. Wash.Rev.Code § 19.28.340 (1961).).

On the other hand, the inspection provision of chapter 542 was merely permissive at the time. § 542.9 (ICC "may" inspect grain dealers). Section 4.1(36)(c) of the Code provides that "may" generally confers a power rather than a duty. Thus inspection by ICC was not mandated. Negligence could not be predicated solely on failure to act.

When ICC did act, however, whether in accordance with a statutory duty or under a statute conferring authority to act, it had a responsibility to act with due care. Performance of a function without due care, resulting in damages, creates liability.

*Cross Bros. Meat Packers, Inc. v. United States,* 705 F.2d 682 (3rd Cir.1983) (negligent supervision and grading of meat creates liability for lost profits); *Doe v. United States,* 520 F.Supp. 1200 (S.D.N.Y.1981) (unreliably and irresponsibly providing FBI with information gives rise to claim for damages); *Raymer v. United States,* 455 F.Supp. 165 (W.D.Ky.1978) (negligently assumed inspection and regulation under Federal Coal Mine Health Act creates liability); *Brennen v. City of Eugene,* 285 Or. 401, 591 P.2d 719 (1979) (city liable to plaintiff injured by taxi driver for negligently licensing taxi cab driver having insufficient insurance); *Namauu v. City and County of Honolulu,* 62 Hawaii 358, 614 P.2d 943 (1980); *Hudleasco, Inc. v. State,* 90 Misc.2d 1057, 396 N.Y.S.2d 1002 (Ct.Cl.1977), *aff'd,* 63 A.D.2d 1042, 405 N.Y.S.2d 784 (1978) (involving certificate under UCC § 9–407(2) and other laws); *Baerlein v. State,* 92 Wash.2d 229, 595 P.2d 930 (1979).

Similarly, negligent performance under rules of governmental agencies establishes liability. *JM Mechanical Corp. v. United States,* 716 F.2d 190 (3rd Cir.1983) (negligence in performance of regulations requiring investigation and verification of validity of payment and performance bonds—valid claim under Federal Tort Claims Act); *Griffin v. United States,* 351 F.Supp. 10, 30 (E.D.Penn.1972), *aff'd,* 500 F.2d 1059 (3rd Cir.1974) (negligence in implementing regulation in release of oral polio vaccine).

The statute here was for the benefit of the class to which plaintiffs belong—producers doing business with grain dealers. The statutory provisions clearly exhibit the legislature's intent that producers receive payment for their grain. *Cf. Wilson,* 282 N.W.2d at 672 (fire inspection statutes designed "for the protection of ... lawful occupants of multiple dwellings"). ICC itself has stated:

> The general legislative intent of the [Grain Dealers] Act, passed in 1973 is to assure that anyone selling grain actually receives payment.

Annual Report of Iowa State Commerce Comm'n (1975).

■ In opposition to substantive liability the State asserts that it would only be liable for negligent licensing or inspecting which results in "physical harm"—citing Restatement (Second) of Torts § 324A (1965). We believe however that liability exists where the very purpose of the statute in question is protection against economic loss and the governmental agency negligently fails to perform under the statute or performs negligently, resulting in such loss. *See National Carriers, Inc. v. United States,* 755 F.2d 675 (8th Cir.1985); *JM Mechanical Corp. v. United States,* 716 F.2d 190 (3rd Cir.1983); *Cross Bros. Meat Packers, Inc. v. United States,* 705 F.2d 682 (3rd Cir.1983). Moreover, our tort claims act expressly covers "loss of property." § 25A.2(5).

The State also asserts the "public duty" doctrine. We rejected the doctrine in *Wilson* with regard to municipalities, as a " 'form of sovereign immunity, which is a matter dealt with by statute ... and not to be amplified by court created doctrine.' " *Wilson,* 282 N.W.2d at 668, *quoting Adams v. State,* 555 P.2d 235, 241–42 (Alaska 1976). In *Wilson* we said that "[t]he legislature could not have expressed better or more consistently its intention to impose—*in the same manner as in the private sector*—municipal tort liability for negligence based on breach of a statutory duty." *Id.* at 669 (emphasis added). The state tort claims act provides that the State is liable "in the same manner, and to the same extent as a private individual under like circumstances...." § 25A.24. It clearly excludes the public duty doctrine.

We hold that failure of ICC to perform mandated duties and performance by ICC of authorized functions without due care constitute negligence.

■ IV. *Tort claims act.* The State contends, however, that plaintiffs' claims do not come under the tort claims act, Chapter 25A of the Code.

A determination that the State acted negligently does not alone establish liability. Inquiry must be made as to whether the State has lifted its cloak of immunity.

*Lloyd v. State,* 251 N.W.2d 551, 556 (Iowa 1977). The inquiry entails determination of whether the action is cognizable under the general waiver in the act and, if so, whether the action is excluded by one of stated exceptions.

The State has waived immunity for "claims". § 25A.4. "Claim" is defined in section 25A.2(5) to include "any claim ... on account of ... loss of property ... caused by the negligent or wrongful act or omission of any employee of the state while acting within the scope of his office or employment, under circumstances where the state, if a private person, would be liable to the claimant for such ... loss...." Inspecting and licensing functions are generally thought of as "uniquely governmental." *Hylin v. United States,* 715 F.2d 1206, 1210 (7th Cir.1983), *vacated and remanded on other grounds,* — U.S. ——, 105 S.Ct. 65, 83 L.Ed.2d 16 (1985). Where the governmental activity is not normally performed by private individuals, the question is whether a private individual doing what the government was doing would be liable for negligence. *Prescott v. United States,* 523 F.Supp. 918, 929 (D.Nev.), *aff'd,* 731 F.2d 1388 (9th Cir. 1981).

Plaintiffs' action against the State is based on ICC's failure to perform, and careless performance of, functions under statutes and regulations. In Iowa if a law "lays down a rule or regulation of conduct specifically designed for the safety and protection of persons or property, injuries proximately resulting from its violation to one who, under the circumstances of the case, is within its purview, ... would be actionable...." *Hansen v. Kemmish,* 201 Iowa 1008, 1011, 208 N.W. 277, 279 (1926). *See Koll v. Manatt's Transportation Co.,* 253 N.W.2d 265, 270 (Iowa 1977) (employer's violation of OSHA or IOSHA standards is negligence per se as to employees and evidence of negligence as to all likely to be exposed to the danger). Under Iowa law private individuals would be liable for conduct such as we have here if the statute and regulations were directed at them.

Thus plaintiffs' claims are within the sweep of chapter 25A.

■ The State argues that plaintiffs claims are nonetheless barred by the exception for "discretionary" functions. Section 25A.14(1) provides that tort liability

[s]hall not apply ... to any claim based upon ... the failure to exercise or perform a discretionary function or duty on the part of a State agency or an employee of the State, whether or not the discretion is abused.

The State contends that negligence with respect to inspections is exempt as a discretionary function because acts only become operational when the State ceases to be a regulator and directly alters the environment of risks, citing *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660, *reh. denied,* — U.S. ——, 105 S.Ct. 26, 82 L.Ed.2d 919 (1984). That decision concerned FAA's safety regulation program and its "spot check" investigations. The Court held that where Congress left to the agency the manner in which inspections should be made, a determination by the agency as to "the extent to which it will supervise the safety procedures of private individuals" is within the discretionary function exception. *Id.* at ——, 104 S.Ct. at 2768, 81 L.Ed.2d at 678. The present case, however, is not a situation comparable with *Varig Airlines* where officials were vested with discretion as to follow-up on inspections by manufacturers.

In its decision the trial court relied on the following language in *Stanley v. State,* 197 N.W.2d 599, 603 (Iowa 1972):

Virtually all the federal decisions on the "discretionary function" exception to governmental tort liability recognize and apply the "planning" and "operational" tests in reaching a decision under particular facts. The difficulty arises in attempting to tell when the one stops and the other begins.

Undoubtedly there are hard cases where planning and operation overlap, but this is not one of them. The decision to keep highway 175 open during con-struction was one within the proper discretionary function for which no liability would attach; but once that decision was made, negligence in carrying out that policy cannot be excused on the ground the negligent acts were performed in the exercise of discretion within the meaning of the statutory exception.

Every act involves discretion. However, the decision not to give proper warning is no more a "discretionary function" as defined in section 24A.14(1) than is the determination to drive a state-owned vehicle in excess of the speed limit.

. . .

Here all exercise of discretion had ceased before the commission of the acts which the trial court found were negligent. We hold the conduct complained of clearly subjects the state to liability under the State Tort Claims Act.

We recently reviewed our case law regarding the discretionary function in *Metier v. Cooper Transport Co., Inc.,* 378 N.W.2d 907 (Iowa 1985). We held that while the decision to place warning signs at deer crossings may be "planning", the conclusion is plain "the failure to carry out that policy by placing such signs at this particular crossing was operational in character." To clarify our position on the planning-operation dichotomy, we cited *Stanley* and *Butler v. State,* 336 N.W.2d 416 (Iowa 1983). In *Butler* we differentiated planning-policy decisions which "involve the weighing of the merits of social, political and economic factors" from operational decisions "necessary to implement the policy decisions." *Id.* at 419–20.

ICC's negligent acts and omissions cannot be excused as a discretionary function. The policy-planning decisions were made by the legislature in enacting the grain dealer's act. But when ICC inspected Prairie Grain it was in the execution phase of the act. It did not have discretion to do so without due care. Nor did it have discretion to relicense an elevator which proper

inspections would have revealed was insolvent.

The conduct found by the trial court to be negligent was in the implementation of statutory requirements. *See Butler v. State*, 336 N.W.2d at 420. The inquiry must not only include analysis of whether judgment was exercised, but also whether the nature of the judgment called for policy considerations. *Griffin v. United States*, 500 F.2d 1059, 1064 (3rd Cir.1974). *See Japan Airlines Co. Ltd. v. State*, 628 P.2d 934 (Alaska 1981) (design decisions by state engineers are operational and not discretionary where they implement basic policy to build taxiway suitable for widebody jets). The functions of ICC did not involve policy which is inherent in the discretionary function exception. *Donohue v. United States*, 459 F.Supp. 465 (E.D.Mich.1978). We hold that the discretionary-function exception is inapplicable.

■ V. *Substantial evidence.* The State challenges several of the trial court's findings of fact. Our review is confined to whether substantial evidence supports the findings. *RET Corp. v. Frank Paxton Co.*, 329 N.W.2d 416, 419 (Iowa 1983).

First, the trial court's finding that in 1978 the examiner failed to examine the required number of scale tickets is supported by the examination exhibit which clearly shows that only seven tickets were analyzed.

The finding that the examiner failed to select the tickets at random is, while controverted, also supported by substantial evidence. The court could reasonably infer from the testimony of Prairie Grain's secretary, Marylyn Countryman, that Raymond Keller selected the tickets to be examined.

The court found that an examiner could not have verified which scale tickets were issued since the last examination because the prior reports did not contain the cut-off for scale tickets for corn and soybeans. This finding is supported by the exhibits themselves. The existence of contradictory evidence lending support to the State's position does not negate the trial court's finding.

Finally, the State challenges the finding that the investigator negligently failed to conduct further investigations when scale tickets selected had no adequate corresponding customer accounts. But the State's characterization of the witness Plummer's testimony as indicating that the spot check procedures were performed correctly is not borne out by the testimony and exhibits.

■ The State also challenges the findings on proximate cause. Negligence is of course irrelevant in the absence of causal connection between it and the injury to the producers. *Lewis v. State*, 256 N.W.2d 181, 189 (Iowa 1977). As we noted in *Adam v. Mt. Pleasant Bank & Trust Co.*, 340 N.W.2d 251, 254 (1983), "The gist of [plaintiff's] claim is that if those duties had been performed the elevator would not have been permitted to engage in the practices that led to the bankruptcy and loss of their grain."

The evidence indicates that Prairie Grain was underreporting its obligations for at least five years. ICC had power to suspend, revoke, or not renew the dealer's license, or to instigate criminal proceedings for violations of the grain dealer's act. ICC also had the duty to act with due care in its administration of the act.

The trial court's findings of negligence and causation have substantial evidentiary support.

■ VI. *Cross appeal.* Because plaintiffs' challenge to the trial court's damage determination may arise again we also address that issue.

Some amounts were collected by the bankruptcy trustee from liquidation of trust assets and from Prairie Grain's bondsmen. These amounts were paid to the producers including plaintiffs. After the trial court ascertained the principal amount of loss of each plaintiff, it deducted the amount such plaintiff received from the trustee.

Plaintiffs object to this deduction for the reason that the State does not have to pay prejudgment interest as other defendants must do. §§ 25A.4, 535.3; *Balster v. State*, 360 N.W.2d 788 (Iowa 1985). They say that if they had sued a private defendant, interest would have run for the extended period that the litigation was pending. They argue that under those circumstances to give the State credit on the principal for payments from other sources is unfair; as we understand them, they contend that the payments should be deducted from the interest which would have accrued if the State had been a private party. They thus conclude, "The district court's judgment should be modified to reflect the full amount of each Plaintiff's loss ... without reduction for any amount that Plaintiff's have recovered from another source."

We hold, however, that to accept plaintiffs' reasoning would in effect circumvent section 25A.4 which exempts the State from liability for prejudgment interest. We uphold the trial court's method of deducting payments by the trustee.

VII. *Disposition.* Plaintiffs cannot recover at all under chapter 543 of the Code. They cannot recover for losses which accrued after June 30, 1978, as a result of ICC's negligence under chapter 542. They are not barred from recovering for losses, if any, which they establish accrued prior to July 1, 1978, as a result of ICC's negligence under chapter 542. We uphold the trial court's findings of negligence and proximate cause under chapter 542, but we remand the case to district court for new findings, on the existing record of the trial, as to the respective plaintiffs' damages, if any, which accrued prior to July 1, 1978, as a result of such negligence, and for judgments accordingly.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

All Justices concur except SCHULTZ, CARTER and WOLLE, JJ., who dissent.

SCHULTZ, Justice (dissenting in part).

I agree with the majority opinion except division III. I do not believe that the legislature, by enacting Iowa Code chapter 542, intended to subject the State to civil liability for its inspectors' failure to perform their duties. I would not hold that a failure to perform such duties constitutes actionable negligence.

CARTER and WOLLE, JJ., join this dissent.