# IN THE SUPREME COURT OF IOWA

No. 14–1180

Filed June 17, 2016

ESTATE OF DAVID PAUL McFARLIN by Its Personal Representative, Jamie Laass; **JAMIE LAASS,** Individually; and **JAMIE LAASS,** as Parent and Next Friend of S.L.,

    Appellants,

vs.

**STATE OF IOWA,**

    Appellee.

---

Appeal from the Iowa District Court for Buena Vista County, Carl J. Petersen, Judge.

Plaintiffs seek further review of court of appeals decision that affirmed summary judgment dismissing tort claims against the State of Iowa arising from boating accident on Storm Lake. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT SUMMARY JUDGMENT AFFIRMED.**

Jay E. Denne and Stanley E. Munger of Munger, Reinschmidt & Denne, LLP, Sioux City, for appellants.

Thomas J. Miller, Attorney General, and Anne Updegraff, Assistant Attorney General, for appellee.

**WATERMAN, Justice.**

This appeal presents several questions of law on the liability of the State of Iowa for a fatal boating accident on Storm Lake. A ten-year-old boy riding in a speedboat died when his mother's boyfriend drove the watercraft at thirty miles per hour between two danger buoys and struck a submerged dredge pipe. The mother filed several tort actions and settled claims against the entities that operated and marked the dredge, the boat manufacturer, and her boyfriend. Her lawsuit against the State alleged its department of natural resources (DNR) shared responsibility for the accident. The district court granted the State's motion for summary judgment on several grounds: statutory immunity, the public-duty doctrine, and the lack of a private right to sue under Iowa statutes regulating use of public waterways. We transferred the mother's appeal to the court of appeals, which affirmed on all three grounds. We granted the mother's application for further review.

For the reasons explained below, we hold that Iowa Code chapters 461A and 462A provide no private right to sue and the public-duty doctrine bars the mother's common law tort claims against the State. Because those twin holdings resolve the appeal, we do not reach the statutory immunity issues. We vacate the decision of the court of appeals and affirm the summary judgment ruling dismissing this action.

## I. Background Facts and Proceedings.

On Memorial Day weekend, May 31, 2010, Harry Foote took his girlfriend, Jamie Laass, and four children fishing on Storm Lake. They lived in South Sioux City, Nebraska. They drove to Storm Lake in Foote's pickup towing his 1850 Lund Tyee speedboat. That model is eighteen-feet long and seats six people. Its top speed is fifty miles per hour. Foote launched the watercraft at 9:30 a.m. from the Lakeside boat ramp.

Storm Lake is open to the public, and boaters pay no fee to use the lake. Foote operated the speedboat with his five passengers: Laass; her ten-year-old son, D.M.; her minor daughter, S.L.; and two other children. Foote had gone walleye fishing on Storm Lake before, and he knew there was an ongoing dredging operation at the lake.

Once Foote left the no-wake zone, he headed west, skimming over the water at a speed greater than thirty miles per hour. A couple fishing in another boat signaled Foote to slow down, but he did not see them. Foote rapidly approached several buoys that were white with black lettering stating "DREDGE PIPE." The buoys displayed an orange diamond, which the boater's manual describes as a danger sign. These buoys marked a submerged pipe used for an ongoing dredging operation. Foote was confused as to the dredge pipe's location and steered the speedboat to pass between two buoys at thirty miles per hour. He saw the dredge pipe immediately before reaching it. The boat's 175 horsepower, 400-pound outboard motor/propeller struck the pipe and flipped into the boat. The propeller was still spinning when it landed in the passenger compartment and struck D.M., who died from his injuries later that day.

Storm Lake is a meandered lake located in Buena Vista County, Iowa. The State of Iowa owns the lakebed and allows the public to use the lake for recreation. The DNR uses Storm Lake as a walleye fishery. The DNR harvests walleye eggs from Storm Lake to stock other Iowa lakes for fishing. The State allowed dredging to begin on the lake in 2002 to improve water conditions for walleyes. Dredging is the process of removing sediment from the bottom of a lake to increase the depth of a lake and improve water quality. The sediment is removed through a pipe from the lake bottom to the location where the sediment is deposited on

shore. When sediment is being removed, the pipe is submerged. When the dredge boat moves the pipe to start on a new area, the pipe can rise to the surface. On the day of the accident, the dredge pipe was marked every 300 feet with white danger buoys.

The State hired a contractor to dredge the first year. After the one-year contract expired, the contractor took its dredging equipment elsewhere. In 2003, the Lakeside Improvement Commission (LIC), an Iowa Code chapter 28E entity, was formed to take over the dredging operation. The LIC is comprised of representatives from Buena Vista County, the City of Storm Lake, the City of Lakeview, and the Lake Preservation Commission, a private nonprofit entity. Buena Vista County owns the dredge and accompanying equipment, and the dredge operators are employees of the City of Storm Lake. The LIC is required to apply annually for a permit from the DNR through the Natural Resources Commission (NRC). *See* Iowa Code § 461A.53 (2009). The permits require the LIC to notify the DNR "prior to the beginning of the construction and upon its completion so it may be ascertained that the state's interests are being protected." The LIC submits a new dredging plan each year, which has been approved annually by the NRC. The DNR reimburses the LIC for the costs of the dredging when its budget permits.

In July 2009, two boaters filed accident reports with the NRC stating their boats had hit the submerged dredge pipe. Reports are filed with the NRC if property damage exceeds $2000. No changes were made to better identify the dredge pipe's location. In 2010, the permitted area for dredging spanned approximately half of the surface area of the lake. The dredging project was expected to take ten to twelve years to complete.

Laass filed three lawsuits on behalf of D.M.'s estate, her daughter, and herself. One action in federal court named as defendants Foote, the dredge operator, local entities operating the dredge equipment (the City of Storm Lake, Buena Vista County, and the LIC), and Brunswick Corporation, the boat manufacturer. The estate recovered a settlement of $1.2 million in that lawsuit. A separate federal court action against Lakeside Marina, Inc. was dismissed on summary judgment on grounds that the defendant had no control over the lake. This appeal arises from the third suit, filed in Buena Vista County, against the DNR and the State of Iowa. The DNR was dismissed as a party on January 14, 2013, leaving the State of Iowa as the sole defendant. The parties proceeded with discovery and developed an evidentiary record regarding responsibility for the dredging and buoys.

There are three types of buoys used on Storm Lake. "No wake" buoys are placed by the DNR. These buoys have a circle and say "slow no wake." Exclusion buoys are placed by the DNR to indicate areas that are off-limits to all vessels. DNR Officer Brent Koppie testified that he places no-wake buoys in the lake in the spring and removes them in the winter. The estate's expert, Marjorie Cooke, also testified that the DNR officers receive training about the placement and management of exclusionary buoys.

Finally, danger buoys are used on Storm Lake to mark rocks, shoals, construction, dams, or stumps. Danger buoys are white with an orange diamond. The record shows that the DNR was not responsible for the placement of those buoys to mark the dredge pipe. To the contrary, Randy Redig, a dredge operator employed by the City of Storm Lake, testified the dredge operators—city employees—controlled and maintained the danger buoys marking the submerged dredge pipe.

Patrick Kelly, the Public Works Director for the City of Storm Lake, explained that the city was responsible for warning boaters about the dredge pipe, and the city had made adjustments to the marking of the pipe after D.M.'s death:

> Q. So your thought was that nobody had the responsibility of making the dredge operation safer for boaters? A. We had the — We had the — It was our responsibility to make it safe, and we felt we've done that.
>
> Q. Okay. A. As much as we can.
>
> Q. Have any changes taken place in the dredging operation since [D.M.] was killed to make it safer? A. The only thing we did is we added some small orange intermediate markers in the dredge pipe.
>
> Q. So now how far apart are they spaced? A. They're roughly 150 feet.

Kelly testified that the DNR was not involved with the day-to-day operations of the dredge:

> Q. What do you do by "day-to-day operations"? A. I'm the go-between between the dredge and the LIC, Lake Improvement Commission, and then I monitor the daily work sheets and troubleshoot anything that they have problems with or make sure they're getting the work done that needs to be done.
>
> Q. Who specifies where the dredge covers on the lake? A. What we do on that is I draw up a plan from year to year. It's submitted to the DNR for their approval, and then DNR writes off on that, and then we schedule it out from there.
>
> . . . .
>
> Q. And what role do you understand the DNR plays in the dredging operation? A. Just oversee it and give us money to operate.
>
> Q. Do they specify how to dredge? A. No.
>
> Q. Do they specify whether—any of the safety precautions relative to dredging? A. No.
>
> Q. Do they—In your view, do they have the ability to specify those things if they want? A. I can't answer that.
>
> Q. Have they been on-site looking at the dredging operation? A. Correct.

Q. How long does that happen? A. Oh, actually going out on the dredge, maybe once or twice a year . . . .

DNR Officer Koppie once raised concerns about the floating pipe being dangerous, and those concerns were addressed:

Q. [W]ho did you express the concern to? A. I expressed the concern through our dispatch to the dredge crew for the City of Storm Lake.

Q. And how do you know it got to the dredge crew? A. Because it was rectified.

Q. Okay. On the occasion you expressed a concern, the pipe stopped floating? A. Yes.

DNR Officer Koppie testified he did not believe he could change the dredge's safety practices:

Q. And do you think you would have authority actually to force something to be done if you see an obvious safety concern? A. Not necessarily. I think I can make that suggestion, I think I can bring it to their attention, but how much weight that carries, I'm not sure.

. . . .

Q. Have you ever raised a concern about the placement or the number of buoys marking the dredge pipe? A. No.

There was also testimony from Redig that he was told by the DNR *after the accident* that the buoys were in the right place.

Plaintiffs alleged the State is liable because it (1) permitted the dredge operator to mark the dredge pipe with buoys every 100 yards instead of every ten or twenty-five yards,[1] (2) allowed the placement of the dredge pipe in violation of Iowa Code section 461A.55, (3) allowed the dredge pipe to remain concealed, (4) allowed the dredge pipe to be in a location where it interfered with boating operations, (5) allowed the dredging equipment to endanger plaintiffs, (6) failed to adequately mark

---

[1]After this incident, intermediate markers were added to the dredge pipe every 50 yards.

the dredge pipe, (7) failed to adequately warn boaters of the nature and extent of the dredging operation, and (8) failed to establish speed limits or warnings in the vicinity of the dredge pipe. The petition included claims for bystander recovery and loss of consortium as well as wrongful-death claims for D.M.'s estate.

On February 28, 2014, the State filed an answer denying liability and pleading various defenses. The State then filed a motion for summary judgment, asserting six independent grounds: (1) there was no waiver of sovereign immunity for torts occurring on a sovereign lake, (2) there was no common law negligence action arising from the role of the State holding the bed of Storm Lake in public trust, (3) the public-duty doctrine precluded a private cause of action, (4) there was no statutory basis for a private cause of action, (5) the State was immune under the recreational use statute, and (6) the State was immune under the discretionary-function exception to the Iowa Tort Claims Act.

The district court granted the State's motion on July 9, 2014. The court held discretionary-function immunity applied, the public-duty doctrine applied, and there was no private cause of action. We transferred the plaintiffs' appeal to the court of appeals, which affirmed the district court on all three grounds. We granted the plaintiffs' application for further review.

## II. Standard of Review.

"We review a district court's ruling on summary judgment for correction of errors at law." *Thomas v. Gavin*, 838 N.W.2d 518, 521 (Iowa 2013). "The evidence is viewed in the light most favorable to the nonmoving party." *Mueller v. Wellmark, Inc.*, 818 N.W.2d 244, 253 (Iowa 2012). We review rulings on statutory construction for correction of errors at law. *Sanon v. City of Pella*, 865 N.W.2d 506, 511 (Iowa 2015).

### III. Analysis.

We first address whether the legislature implicitly created a private right to sue under the statutes empowering the DNR to regulate use of Storm Lake and then address whether the public-duty doctrine bars plaintiffs' common law tort claims. Because our answers to those questions resolve the appeal, we decline to reach the remaining issues of statutory immunity.

**A. Do Iowa Code Chapters 461A and 462A Provide a Private Right to Sue?** Plaintiffs claim that provisions in Iowa Code chapters 461A and 462A create a private right to sue. This is a question of statutory interpretation. The district court and court of appeals determined there was no private right to sue in those chapters. We agree.

"Not all statutory violations give rise to a private cause of action. A private statutory cause of action exists 'only when the statute, explicitly or implicitly, provides for such a cause of action.' " *Mueller*, 818 N.W.2d at 254 (quoting *Sanford v. Manternach*, 601 N.W.2d 360, 371 (Iowa 1999)). "A private right of action is the right of an individual to bring suit to remedy or prevent an injury that results from another party's actual or threatened violation of a legal requirement." *Shumate v. Drake Univ.*, 846 N.W.2d 503, 507 (Iowa 2014) (quoting *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 296 (3d Cir. 2007) (footnote omitted)). A private, statutory cause of action only exists "if the legislature intended 'to create not just a private right but also a private remedy.' " *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286, 121 S. Ct. 1511, 1519, 149 L. Ed. 2d 517, 528 (2001)).

Plaintiffs argue four provisions in chapter 461A—sections 461A.3, 461A.52, 461A.53, and 461A.55—read together with section 462A.12(1)

create a private cause of action.[2]  Section 461A.3 sets forth the NRC's "Duties as to parks":

> It shall be the duty of the commission to establish, maintain, improve, and beautify public parks and preserves upon the shores of lakes, streams, or other waters, or at other places within the state which have become historical or which are of scientific interest, or which by reason of their natural scenic beauty or location are adapted therefor. *The commission shall have the power to maintain, improve or beautify state-owned bodies of water, and to provide proper public access thereto.*  The commission shall have the power to provide and operate facilities for the proper public use of the areas above described.

Iowa Code § 461A.3 (emphasis added); *see id.* § 461A.1(1) (defining commission to mean the NRC).  Section 461A.52 states,

> No person shall remove any ice, sand, gravel, stone, wood, or other natural material from any lands or waters under the jurisdiction of the commission without first entering into an agreement with the commission.

*Id.* § 461A.52.  Section 461A.53 regulates contracts to remove natural materials from state-owned land:

> The commission may enter into agreements for the removal of ice, sand, gravel, stone, wood, or other natural material from lands or waters under the jurisdiction of the commission if, after investigation, it is determined that such removal will not be detrimental to the state's interest.  The commission may specify the terms and consideration under which such removal is permitted and issue written permits for such removal.

*Id.* § 461A.53.  Section 461A.55, entitled "Dredging," provides,

> In removing sand, gravel, or other material from state-owned waters by dredging, the operator shall so arrange the operator's equipment that *other users of the lake* or stream *shall not be endangered by cables, anchors, or any concealed equipment.* No waste material shall be left in the water in

---

[2]Plaintiffs cited additional Code provisions in district court: Iowa Code sections 461A.26, 462A.17, 462A.23, and 462A.32.  None of those provisions changes our analysis.

such manner as to endanger other craft or to change the course of any stream.

*Id.* § 461A.55 (emphasis added); *see also id.* § 461A.57 (providing a violation of section 461A.55 is a simple misdemeanor). Iowa Code section 462A.12(1) states, "No person shall operate any vessel . . . in a careless, reckless or negligent manner so as to endanger the life, limb or property of any person."

No provision in chapter 461A or 462A *expressly* creates a private right to sue. We therefore apply our four-factor test to determine whether an implied private right of action exists:

> (1) whether "the plaintiff [is] a member of the class for whose special benefit the statute was enacted"; (2) "[l]egislative intent, either explicit or implicit, to create or deny a remedy"; (3) whether "a private cause of action [is] consistent with the underlying purpose" of the statute; and (4) whether "the implication of a private cause of action [will] intrude into an area over which the federal government has exclusive jurisdiction or which has been delegated exclusively to a state administrative agency."

*Shumate,* 846 N.W.2d at 508 (quoting *Seeman v. Liberty Mut. Ins. Co.,* 322 N.W.2d 35, 41–43 (Iowa 1982)). "Our 'central inquiry' is whether the legislature intended to create a private right to sue." *Id.* at 509. "If any one of these factors is not satisfied, there is no implied cause of action." *Kolbe v. State,* 625 N.W.2d 721, 727 (Iowa 2001).

We conclude the plaintiffs failed to satisfy the second factor because we are unable to glean any legislative intent in these statutes to create a private right to sue. Rather, chapters 461A and 462A provide a detailed regulatory regime to protect the use of public lands and waters for the benefit of the general public. We have repeatedly declined to find an implied private right to sue under general regulatory statutes. *See Mueller,* 818 N.W.2d at 254–58 (holding statutes regulating health insurance did not provide private right to sue); *Stotts v. Eveleth,* 688

N.W.2d 803, 808–09 (Iowa 2004) (holding Iowa Code chapter 272, intended as a regulatory measure for teacher licensing, has no implied private right to sue); *Kolbe*, 625 N.W.2d at 727 ("Iowa Code section 321.177(7) was intended to be a regulatory measure designed to do nothing more than simply limit the driving privileges of those who are incapable of operating a motor vehicle safely. It is devoid of any suggestion of a private remedy."); *Unertl v. Bezanson*, 414 N.W.2d 321, 325–26 (Iowa 1987) (finding no private right to sue under Iowa Code chapter 536A, regulating industrial loan companies); *Seeman*, 322 N.W.2d at 41–42 (holding chapter 507B, regulating insurance trade practices, created no private right to sue insurer). Plaintiffs cite no regulatory statutes comparable to chapters 461A or 462A that we have interpreted to provide a private right of action. "We believe that, had the legislature intended to create a private right of action . . . [,] it would have said so clearly." *Marcus v. Young*, 538 N.W.2d 285, 290 (Iowa 1995) (quoting *Unertl*, 414 N.W.2d at 326).

We reject the plaintiffs' argument that the misdemeanor provisions support a private right of action. *See Schumate*, 846 N.W.2d at 515–16 (noting the legislature could reasonably conclude criminal penalties were sufficient to deter statutory violations); *cf. Seeman*, 322 N.W.2d at 42 (concluding administrative enforcement remedies were adequate to achieve legislative purpose).

Because the plaintiffs must satisfy all four factors and fail under the second, we need not address the other three. *Kolbe*, 625 N.W.2d at 727 ("To resolve the issue, we address only the second factor . . . ."). We hold that Iowa Code chapters 461A and 462A do not create an implied private right to sue. We turn next to plaintiffs' common law claims.

**B. Does the Public-Duty Doctrine Bar Plaintiffs' Common Law Tort Claims?** The district court ruled that the public-duty doctrine bars plaintiffs' common law claims against the State, and the court of appeals affirmed on that ground. Plaintiffs, relying on *Summy v. City of Des Moines*, contend the public-duty doctrine does not apply here. 708 N.W.2d 333, 344 (Iowa 2006). We conclude *Summy* is inapplicable and the controlling decision is *Kolbe*, which precludes liability to individuals based on breach of a duty the state owes to the public at large.

Under the public-duty doctrine, "if a duty is owed to the public generally, there is no liability to an individual member of that group." *Kolbe*, 625 N.W.2d at 729 (quoting *Wilson v. Nepstad*, 282 N.W.2d 664, 667 (Iowa 1979) (en banc)).

> [A] breach of duty owed to the public at large is not actionable unless the plaintiff can establish, based on the unique or particular facts of the case, a special relationship between the State and the injured plaintiff consistent with the rules of Restatement (Second) of Torts section 315.

*Id.* (emphasis omitted). Section 315 states,

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

Restatement (Second) of Torts § 315 (Am. Law Inst. 1965) [hereinafter Restatement (Second)]. In *Raas v. State*, we confronted and rejected an argument that we should abandon the public-duty doctrine, as some other states have done, because the doctrine was supplanted by the enactment of tort claims statutes that partially abrogate sovereign immunity. 729 N.W.2d 444, 448–49 (Iowa 2007) (noting we had rejected

that argument in *Kolbe*). We distinguished the public-duty doctrine from statutory tort immunity: "Unlike immunity, which protects a municipality from liability for breach of an otherwise enforceable duty to the plaintiff, the public duty rule asks whether there was any enforceable duty to the plaintiff in the first place." *Id.* at 448 (quoting 18 Eugene McQuillin, *McQuillin on Municipal Corporations* § 53.04.25 (3d ed. 2006)). We determined the public-duty doctrine remains "alive and well in Iowa." *Id.* at 449; *see also Cope v. Utah Valley State Coll.*, 342 P.3d 243, 249–50 (Utah 2014) (surveying authorities to conclude the "public duty doctrine is recognized in most jurisdictions" and rejecting argument to abandon the doctrine); 18 Eugene McQuillin, *The Law of Municipal Corporations* § 53.18, 246–51 (3d ed. rev. vol. 2013) [hereinafter McQuillin] (noting the "public duty rule [is] in effect in most jurisdictions" and "protects municipalities from failure to adequately enforce general laws and regulations, which were intended to benefit the community as a whole."). *But see Coleman v. E. Joliet Fire Prot. Dist.*, 46 N.E.3d 741, 757–58 (Ill. 2016) (abolishing public-duty doctrine because its purposes "are better served by application of conventional tort principles and the immunity protection afforded by statutes").[3] The plaintiffs, relying on *Summy,* argue the public-duty doctrine is inapplicable to the facts of this case but do not ask us to overrule *Raas* and *Kolbe* and abandon the public-duty doctrine. We do not ordinarily overrule our precedent sua sponte.

---

[3]Two justices concurred on different grounds. *Coleman*, 46 N.E.3d at 758–60 (Freeman, J., specially concurring). Three justices dissented. *Id.* at 760–68 (Thomas, J., dissenting). The dissent stated the lead opinion and concurring opinion "both make a mockery of *stare decisis*." *Id.* at 761. A noted commentator observed, "The legislature's abrogation of absolute sovereign immunity does not lead to the conclusion that the public duty doctrine also has been abrogated . . . ; there still must be proof of a duty owed . . . ." McQuillin, § 53.18, at 38–39 (2015 Cumulative Supp.).

In *Thompson v. Kaczinski*, we adopted section 7 of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm. 774 N.W.2d 829, 835 (Iowa 2009). The reporter's note to section 7 acknowledges the continued vitality of the public-duty doctrine:

> *Deference to discretionary decisions of another branch of government.* The "public-duty" doctrine is often explained as preventing government tort liability for obligations owed generally to the public, such as providing fire or police protection. Only when the duty is narrowed to the injured victim or a prescribed class of persons does a tort duty exist.

Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 7 reporter's note cmt. *g*, at 93–94 (Am. Law Inst. 2010) [hereinafter Restatement (Third)] (collecting cases).[4] Section 37 provides that "[a]n actor whose conduct has not created a risk of physical . . . harm to another has no duty of care to the other unless a court determines that one of the affirmative duties provided in §§ 38–44 is applicable." Restatement (Third) § 37, at 2 (Am. Law Inst. 2012). Section 40, entitled "Duty Based on Special Relationship with Another" provides that "[a]n actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship." *Id.* § 40(a), at 39. We conclude the public-duty doctrine remains good law after our adoption of sections of the Restatement (Third) of Torts.

---

[4]The plaintiffs have not argued the Restatement (Third) undermines the public-duty doctrine in district court or in their appellate briefings. The district court concluded the public-duty doctrine continues under the Restatement (Third) as a countervailing principle or policy under section 7, noting comment *g*. The State argued below and on appeal that the public-duty doctrine remains intact after our adoption of section 7. Because the district court ruled the doctrine continues under the Restatement (Third), and the parties had the opportunity to brief the issue, that question is ripe for determination by our court. *Cf. Hagenow v. Schmidt*, 842 N.W.2d 661, 676–77 (Iowa 2014) ("[N]either the parties nor the district court raised the provisions of the Restatement (Third) when instructing the jury in this case. We defer for another day our consideration of these provisions . . . .").

We declined to apply the public-duty doctrine in *Summy*. 708 N.W.2d at 344. Richard Summy was golfing at Waveland Golf Course owned by the City of Des Moines when he was struck in the eye by a golf ball while standing on the eighteenth fairway. *Id.* at 335. The golf ball had been hit by a golfer from the tee for the first hole. *Id.* Summy sued the city, alleging it negligently failed to provide a tree screen to protect players from errant flying golf balls. *Id.* at 336. The jury found Summy twenty-five percent at fault and the city seventy-five percent at fault. *Id.* at 337. The city appealed on multiple grounds, and we affirmed. *Id.* at 337, 344–45. We addressed the public-duty issue in a single paragraph, citing and distinguishing *Kolbe* as follows:

> The City also relies on the public-duty doctrine: if the government owes a duty to the general public, it has no liability to any one individual when it fails to perform this public duty. *This doctrine is inapplicable here because the City's duty was one owed to invitees on the golf course, not to the public at large.* We conclude, therefore, that the trial court did not err in refusing to direct a verdict in favor of the City.

*Id.* at 344 (emphasis added) (citation omitted); *see also Kolbe*, 625 N.W.2d at 729 (stating doctrine does not apply if there is a particular relationship between the government entity and the injured plaintiff that gives rise to a special duty).

The plaintiffs argue boaters on Storm Lake, like golfers at Waveland Golf Course, have the requisite special relationship with the government-owner to avoid the public-duty doctrine. We disagree. Golfers pay to use the Waveland Golf Course as business invitees. The city was both landowner and proprietor operating Waveland as a business for paying customers. Golfers proceed through the course in small groups, hole-by-hole in sequence. Members of the general public are not allowed to wander freely around Waveland while golfers are

playing. By contrast, Storm Lake is open to the public free of charge.[5] Boaters may traverse the lake freely and come and go as they please, like motorists using public roads. *See Witke v. State Conservation Comm'n*, 244 Iowa 261, 267, 56 N.W.2d 582, 586 (1953) ("It is a general rule that the state cannot add to its revenues by selling to individuals the right to enjoy such use of public waters as rightfully belong to the public at large, such as boating . . . ." (quoting 56 Am. Jur. § 215, at 676)). Moreover, the city alone operated the golf course at Waveland. Local entities, not the State, operated the dredging equipment at Storm Lake.

This case is more like *Kolbe* than *Summy.* In *Kolbe,* we applied the public-duty doctrine to affirm summary judgment for the state, dismissing tort claims alleging the department of transportation (DOT) negligently issued a drivers' license to a visually impaired driver, Justin Schulte. 625 N.W.2d at 724–25, 729–30. Five days after Schulte's license was reissued, he was driving on a county road and struck a bicyclist, Charles Kolbe, inflicting severe injuries. *Id.* at 724. Kolbe sued the State, alleging that it "negligently and without adequate investigation issued driving privileges" to Schulte despite knowledge of his impaired vision. *Id.* at 724–25. Kolbe claimed Iowa Code chapter 321 created a particularized class—"rightful users of the Iowa roads." *Id.* at 728. The district court granted the state's motion for summary judgment. *Id.* at 725. In affirming the summary judgment on the public-duty doctrine, we

---

[5]The boat registration fee Foote paid to use his watercraft in Iowa did not create a special relationship with the State that avoids the public-duty doctrine. *See Kolbe*, 625 N.W.2d at 729–30 (finding state's role in issuing drivers' licenses did not create special class); *Mastbergen v. City of Sheldon*, 515 N.W.2d 3, 5 (Iowa 1994) (per curiam) (applying public-duty doctrine to affirm summary judgment dismissing negligence claims against city for failing to prevent robbery of jewelry store and rejecting argument that monthly fee to police department to connect and monitor silent alarm created special relationship).

held the requisite special relationship was lacking because "the licensing provisions in Iowa Code chapter 321, and more specifically Iowa Code section 321.177(7), are for the benefit of the public at large." *Id.* at 729. We reach the same conclusion as to the DNR's role at Storm Lake. Boaters at Storm Lake, like motorists driving on Iowa roadways, are members of the general public, not a special class of "rightful users of the lake" for purposes of the public-duty doctrine. Plaintiffs cite no case to the contrary from any jurisdiction.[6]

The district court correctly ruled that any duty of the State to enforce statutory obligations of the dredge operators "was owed to the general public, just as the duty to enforce the rules of the road against dangerous drivers are owed to the public in general." The court of appeals likewise held the State did not have a special duty to the plaintiffs. We agree.

The public-duty doctrine applies when the state's duty is owed to the general public rather than to a particularized group of persons. In *Sankey v. Richenberger*, we applied the public-duty doctrine and declined to find a special duty to protect a particularized class in a much smaller

---

[6]Several cases before *Kolbe* allowed motorists to bring negligence claims against counties based on dangerous roadways. *Harryman v. Hayles*, 257 N.W.2d 631, 638 (Iowa 1977) (noting duties owed to "all those rightfully using the roads" in Lee County), *overruled on other grounds by Miller v. Boone Cty. Hosp.*, 394 N.W.2d 776, 781 (Iowa 1986); *Symmonds v. Chi., Milwaukee, St. Paul & Pac. R.R.*, 242 N.W.2d 262, 265 (Iowa 1976) (noting duties owed to "the traveling public" in Scott County). We no longer recognize county-wide special classes of motorists after *Kolbe*. In *Donahue v. Washington County*, the plaintiffs' two-year-old daughter was mauled by a dog that a county deputy had failed to impound despite two prior complaints. 641 N.W.2d 848, 850 (Iowa Ct. App. 2002). The court of appeals affirmed a summary judgment dismissing the plaintiffs' negligence claims under the public-duty doctrine, holding the duties to impound dangerous dogs was owed to the public at large. *Id.* at 852. The court of appeals rejected the plaintiffs' argument that *Harryman* and *Symmonds* supported a finding a special relationship or class protected by the animal control ordinance and instead correctly applied *Kolbe*. *Id.* at 851–52.

location than Storm Lake—a city council meeting open to the public. 456 N.W.2d 206, 209–10 (Iowa 1990) (affirming summary judgment dismissing negligence claims against the Mt. Pleasant police chief for failing to prevent fatal shooting spree). We concluded the chief's duties were owed to the general public. *Id.* We rejected the plaintiffs' argument that we had abrogated the public-duty doctrine in *Wilson*. *Id.* at 209 (distinguishing *Wilson*, 282 N.W.2d at 673). *Wilson* involved tort claims brought by fire victims alleging negligent inspection of the specific building they occupied. 282 N.W.2d at 666. In *Kolbe*, we distinguished *Wilson* on grounds the fire codes at issue "*were not designed to protect the general public*, but rather were designed to protect a 'special, identifiable group of persons.' " *Kolbe*, 625 N.W.2d at 729 (quoting *Wilson*, 282 N.W.2d at 672). That class was the "lawful occupants of multiple dwellings." *Wilson*, 282 N.W.2d at 672. Unlike the residential apartment units leased to private tenants in *Wilson*, Storm Lake is open to the public. We also distinguished *Adam v. State*, 380 N.W.2d 716, 723 (Iowa 1986) (en banc), as involving a special class. *Kolbe*, 625 N.W.2d at 729. In *Adam*, we rejected the State's public-duty defense because the statute was enacted "for the benefit of the class to which plaintiffs belong—producers doing business with grain dealers." 380 N.W.2d at 723. We noted the intent of the legislature was to ensure the persons selling grain received payment. *Id.* No such particularized class exists in this case—*all* members of the public are free to use Storm Lake. We decline to limit the public-duty doctrine merely because the claim arose in a confined geographic area such as a public lake.

The Washington Supreme Court applied the public-duty doctrine in a recreational boating accident case in *Ravenscroft v. Washington Water Power Co.*, 969 P.2d 75, 85–86 (Wash. 1998) (en banc). The facts

of that accident are tragically similar to D.M.'s death on Storm Lake. Robert Ravenscroft was a passenger in a boat on the Spokane River that "struck a submerged, rooted tree stump. When the boat hit the stump, the outboard motor broke off from its attachment and flipped into the boat, striking Mr. Ravenscroft on the head and shoulder." *Id.* at 77. The accident occurred in a channel where the water level was controlled by the power company. *Id.* at 78. Ravenscroft sued the power company and the county for failure to warn boaters of the submerged tree stumps, relying on the county's role in boater safety programs under a cooperation agreement. *Id.* at 77, 84. The trial court granted partial summary judgment, and the state supreme court on interlocutory appeal held the public-duty doctrine barred the claims against the county. *Id.* at 79, 85–86. The Washington Supreme Court acknowledged the county's duty under the cooperation agreement went no further than its duty imposed by state statutes and regulations to promote boater safety. *Id.* at 85. In holding the public-duty doctrine barred the claims against the county, the court specifically declined to find the county owed duties "for safety of recreational boaters as a specific class." *Id.* at 86.

In *Cox v. Department of Natural Resources*, the Missouri Court of Appeals applied the public-duty doctrine to affirm the dismissal of tort claims arising from a diving accident at a state-owned lake. 699 S.W.2d 443, 449 (Mo. Ct. App. 1985). David Cox was swimming within an area roped off with buoys. *Id.* at 445. He "made a shallow surface dive, struck his head on a submerged, hidden, tree stump and became an instant quadriplegic." *Id.* He sued the state, and the trial court granted the state's motion to dismiss based on the public-duty doctrine and other grounds. *Id.* The appellate court affirmed, expressly rejecting the plaintiffs' argument the state's "duty to provide a physically safe

swimming area was a duty to David Cox, as an individual . . . [or as a member] of a certain class of persons who chose" to swim there. *Id.* at 449. Rather, the court held the "duty to maintain a safe swimming area was one owed to the public." *Id.* A few years later, the Missouri Supreme Court, citing *Cox,* applied the public-duty doctrine to terminate tort claims against a state park superintendent arising from the drowning death of a boy scout in a river within a state-owned public park. *State ex rel. Barthelette v. Sanders,* 756 S.W.2d 536, 537–38 (Mo. 1988) (en banc) (citing *Cox,* 699 S.W.2d at 449). The Missouri Supreme Court held the park superintendent's

> duty regarding safety measures was owed to the public at large rather than to the decedent in particular, for the decedent's interest in the safety of the park was indirect and indistinct from that of the public as a whole.

*Id.* at 538.[7]

We hold the State's safety-related duties at Storm Lake were owed to the general public, and we decline to recognize a special relationship or particularized class of recreational boaters to avoid the public-duty doctrine.

The public-duty doctrine applies notwithstanding the State's ownership of Storm Lake. The State owns the lake in trust for the benefit of the public:

---

[7]In *Southers v. City of Farmington,* the Missouri Supreme Court partially abandoned the public-duty doctrine as to government entities on claims that the legislature specifically abolished sovereign immunity. 263 S.W.3d 603, 613 (Mo. 2008) (en banc) (reinstating tort claims against city arising from injuries caused during high-speed police chase). The *Southers* court, however, cited *Barthelette* for the proposition that the public-duty doctrine continues to protect state actors when the state's duty is owed to the general public. *Id.* at 621. As noted, we declined to abandon the public-duty doctrine in *Raas* and *Kolbe.*

That the title to the lake bed is in the state; that such title is not proprietary but is in the nature of a trusteeship, which confers upon the state a burden rather than a benefit; that the power and the duty conferred upon the state under such title is to maintain and promote the navigation and navigability of such lake . . . —these are propositions not in dispute.

*Peck v. Alfred Olsen Constr. Co.*, 216 Iowa 519, 522, 245 N.W. 131, 132–33 (1932). "The public trust doctrine is based on the notion that the State is a steward of our natural resources." *Fencl v. City of Harpers Ferry*, 620 N.W.2d 808, 814 (Iowa 2000). As part of that doctrine, "all persons have a right to use the navigable waters of the state, so long as they do not interfere with their use by other citizens, subject to regulation by the state under its police powers." *Witke*, 244 Iowa at 271, 56 N.W.2d at 588. The public-trust doctrine and public-duty doctrine fit hand in glove.

Plaintiffs, relying on *Orr v. Mortvedt,* argue the State's ownership interest in Storm Lake is comparable to a private owner of a private lake. 735 N.W.2d 610, 615–16 (Iowa 2007). That case addressing private lake ownership is distinguishable from state ownership in public trust. In *Orr,* we considered whether a private landowner could prevent a neighbor from entering or using the water over the landowner's privately owned lakebed. We said,

The public generally has a right of access to navigable watercourses. . . . [T]he jurisprudence of this country has extended the definition of "navigable" to refer to watercourses "susceptible of use for purposes of commerce" or "possess[ing] a capacity for valuable floatage in the transportation to market of the products of the country through which it runs." "Navigable water has been likened to a public highway," "used or usable as a broad highroad for commerce."

*Id.* (first quoting *Monroe v. State*, 175 P.2d 759, 761 (Utah 1946); then quoting *McCauley v. Salmon*, 234 Iowa 1020, 1022–23, 14 N.W.2d 715,

716 (1944); and then quoting *Mountain Props., Inc., v. Tyler Hill Realty Corp.,* 767 A.2d 1096, 1100 (Pa. Super. Ct. 2001)). We held in *Orr* that the private landowner could prevent a neighbor from intruding on the waters of his privately owned lakebed. *Id.* at 616–18. Plaintiffs contend that *Orr* shows the owner of a lakebed also has control of the lake. But, unlike a private landowner, "the incidents of [the State's] 'ownership' are closely circumscribed" by the public-trust doctrine. *State v. Sorensen,* 436 N.W.2d 358, 361 (Iowa 1989). Because the State's duties regarding Storm Lake are owed to the general public, the public-duty doctrine applies.

It is undisputed the dredge pipe and equipment were owned and operated by local entities, not the State. The DNR did not place the buoys marking the location of the submerged pipe; city employees placed them. The LIC controlled day-to-day dredging operations. Liability follows control, and an owner who transfers control to others is not liable for injuries. *See McCormick v. Nikkel & Assocs., Inc.,* 819 N.W.2d 368, 374 (Iowa 2012) ("The reason is simple: The party in control of the work site is best positioned to take precautions to identify risks and take measures to improve safety."); *Van Essen v. McCormick Enters., Co.,* 599 N.W.2d 716, 720–21 (Iowa 1999) (affirming summary judgment for property owner who transferred control of grain bin to lessee-operator); *Allison ex rel. Fox v. Page,* 545 N.W.2d 281, 283 (Iowa 1996) ("The general rule and exceptions reveal a common principle: liability is premised upon control.").

The DNR had regulatory oversight duties for dredging for the benefit of the public at large. To the extent its duties included ensuring boaters' safety, the DNR's role is akin to a police officer or park ranger. We "have consistently held that law enforcement personnel do not owe a

particularized duty to protect individuals; rather, they owe a general duty to the public." *Morris v. Leaf*, 534 N.W.2d 388, 390 (Iowa 1995) (collecting cases). This is true regardless of the state's ownership of roads and lakes.

For these reasons, the district court correctly granted summary judgment based on the public-duty doctrine. Because we decide the common law claims on that ground, "we need not address the immunity issue." *Kolbe*, 625 N.W.2d at 725.

**IV. Conclusion.**

For the foregoing reasons, we vacate the decision of the court of appeals and affirm the district court's summary judgment dismissing this action.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT SUMMARY JUDGMENT AFFIRMED.**

All justices concur except Hecht, Wiggins, and Appel, JJ., who concur in part and dissent in part.

**HECHT, Justice (concurring in part and dissenting in part).**

I agree with the majority's conclusion that various provisions in chapter 461A, standing alone, do not create a private right of action for alleged violation of them. However, I dissent on the other issues because I believe the public-duty doctrine does not foreclose the common law claims and discretionary-function immunity does not arise under the circumstances of this case. I would vacate the decision of the court of appeals, reverse the district court's summary judgment ruling, and remand for trial.

## I. The Public-Duty Doctrine.

The public-duty doctrine is not new. *See Held v. Bagwell*, 58 Iowa 139, 144, 12 N.W. 226, 228–29 (1882) (concluding a county supervisor owed a duty "for the benefit of the public" but owed no duty to the individual plaintiff). But our understanding of tort law principles has changed significantly since the nineteenth century, and our current understanding justifies a fresh look at the doctrine.

The legislature enacted the Iowa Tort Claims Act (ITCA) in 1965. *See generally* 1965 Iowa Acts ch. 79. The ITCA abrogated—with some express exceptions now codified in Iowa Code section 669.14 (2009)—the former rule of governmental immunity and made the state liable for negligence "to the same claimants, in the same manner, and to the same extent as a private individual under like circumstances." 1965 Iowa Acts ch. 79, § 4; *accord* Iowa Code § 669.4. Notably, the common law public-duty doctrine is not among the express exceptions to the waiver of immunity. *See* Iowa Code § 669.14; *see also Maple v. City of Omaha*, 384 N.W.2d 254, 260 (Neb. 1986) (acknowledging some exceptions to liability in Nebraska's political subdivisions tort claims act, but noting "[n]owhere

is there found an exemption for the exercise of a duty owed to the public generally"); *Brennen v. City of Eugene*, 591 P.2d 719, 725 (Or. 1979) (en banc) ("In abolishing governmental tort immunity, the Legislature specifically provided for certain exceptions under which immunity would be retained, and we find no warrant for judicially engrafting an additional exception onto the statute." (Citation omitted.)).

The phrase "the state shall be liable" in section 669.4 is susceptible to two reasonable interpretations. It might mean only that the legislature intended to remove the immunity the state previously enjoyed when it otherwise owed a duty. But it might also mean the legislature intended to lift the state's immunity with certain enumerated exceptions *and* put the state and private individuals on equal footing with respect to tort liability. I believe the second interpretation is correct because it gives meaning to the related phrase "to the same claimants, in the same manner, and to the same extent as private individuals." Iowa Code § 669.4; *see id.* § 4.4(2) ("The entire statute is intended to be effective."); *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 520 (Iowa 2012) (noting we interpret statutes to give all words and phrases meaning while assuming no provision is superfluous). We must give meaning to the legislature's clear expression of the principle of sameness in this tort liability context.

We recognized the importance of the sameness principle in 1979, relying on an Alaska decision that rhetorically asked, "Why should the establishment of duty become more difficult when the state is the defendant?" *Wilson v. Nepstad*, 282 N.W.2d 664, 668 (Iowa 1979) (quoting *Adams v. State*, 555 P.2d 235, 242 (Alaska 1976)). If the state is to be treated like a private litigant, the public duty doctrine must give way because its practical effect is to "create immunity where the legislature has not." *Adams*, 555 P.2d at 242; *see also Leake v. Cain*,

720 P.2d 152, 160 (Colo. 1986) (en banc) ("[W]hether or not the public duty rule is a function of sovereign immunity, the effect of the rule is identical to that of sovereign immunity. Under both doctrines, the existence of liability depends entirely upon the public status of the defendant."); *Hudson v. Town of E. Montpelier*, 638 A.2d 561, 566 (Vt. 1993) ("[A]lthough the [public-duty] doctrine is couched in terms of duty rather than liability, in effect, it resurrects the governmental immunities that have been abrogated or limited . . . ."). We further noted in *Wilson* that "the trend in this area is toward liability," *Wilson*, 282 N.W.2d at 667, and unequivocally concluded "[t]he legislature could not have expressed better or more consistently its intention to impose in the same manner as in the private sector . . . tort liability for negligence," *id.* at 669. This year, the Illinois Supreme Court used similar reasoning in concluding "the legislature's enactment of statutory immunities has rendered the public duty rule obsolete." *Coleman v. E. Joliet Fire Prot. Dist.*, 46 N.E.3d 741, 756 (Ill. 2016).[8]

---

[8]Illinois is the latest jurisdiction to join the group that has retreated from, abolished, rejected, limited, or abandoned the public-duty doctrine. *See, e.g.*, *Adams*, 555 P.2d at 241 (concluding the public-duty "doctrine is in reality a form of sovereign immunity, which is a matter dealt with by statute . . . and not to be amplified by court-created doctrine"); *Leake*, 720 P.2d at 160 ("[W]e reject the public duty rule in Colorado. . . . [T]he duty of a public entity shall be determined in the same manner as if it were a private party."); *Southers v. City of Farmington*, 263 S.W.3d 603, 613 (Mo. 2008) (en banc) ("[T]his court is no longer willing to apply the judicially-created protections of the public duty doctrine in a way that would insulate government entities from tort liability where the legislature has expressly abolished such immunity."); *Maple*, 384 N.W.2d at 260–61 (rejecting the public-duty doctrine but nonetheless concluding as a matter of law that the defendant did not breach the duty it owed); *Schear v. Bd. of Cty. Comm'rs*, 687 P.2d 728, 732, 734 (N.M. 1984) (declining to "breathe new life into" the public-duty doctrine because it is "a ghost of sovereign immunity . . . and is inconsistent" with the state tort claims act); *Ficek v. Morken*, 685 N.W.2d 98, 107 (N.D. 2004) (referring to those jurisdictions that retain the public-duty doctrine as "the minority view" and "refus[ing] to adopt the public-duty doctrine as a part of North Dakota law"); *Wallace v. Ohio Dep't of Commerce*, 773 N.E.2d 1018, 1027 (Ohio 2002) ("It is spurious logic to conclude that a doctrine that is, by definition, available only to *public* defendants can be consistent with a statute mandating that

I acknowledge that we stated in 2007—after deciding *Wilson*—that the public-duty doctrine is "alive and well in Iowa." *Raas v. State*, 729 N.W.2d 444, 449 (Iowa 2007). I think that characterization of the doctrine was inapt. Although we have applied the public-duty doctrine since the ITCA's enactment, we have repeatedly narrowed its scope and often applied exceptions to it. *See Kolbe v. State*, 625 N.W.2d 721, 729 (Iowa 2001).

---

suits be determined in accordance with rules of law applicable to *private* parties."); *Brennen*, 591 P.2d at 725 ("[A]ny distinction between 'public' and 'private' duty is precluded by statute in this state."); *Catone v. Medberry*, 555 A.2d 328, 333–34 (R.I. 1989) (declining to revive the public-duty doctrine because it "would effectively smuggle back into law the doctrine of sovereign immunity that [the state tort claims act] was designed to constrain"); *Hudson*, 638 A.2d at 568 (declining to adopt the public-duty doctrine and concluding the doctrine is "confusing and inconsistent"); *DeWald v. State*, 719 P.2d 643, 653 (Wyo. 1986) ("The public-duty/special-duty rule was in essence a form of sovereign immunity and viable when sovereign immunity was the rule. The legislature has abolished sovereign immunity in this area. The public duty [doctrine] . . . is no longer viable."); *see also Beaudrie v. Henderson*, 631 N.W.2d 308, 313–14 (Mich. 2001) (limiting the public-duty doctrine only to one category of cases involving police protection, and noting the doctrine, if applied any more broadly than that, "is tantamount to a grant of common-law governmental immunity"); *Doucette v. Town of Bristol*, 635 A.2d 1387, 1390 (N.H. 1993) (discarding the public-duty doctrine for municipal defendants in part because the doctrine never applied in that jurisdiction to state tort claims); *Thompson v. Waters*, 526 S.E.2d 650, 652 (N.C. 2000) (noting the public-duty doctrine had never been applied in that jurisdiction "to a claim against a municipality or county in a situation involving any group or individual other than law enforcement," and declining to extend the doctrine any further).

Utah and many other jurisdictions retain the public-duty doctrine. *See Cope v. Utah Valley State Coll.*, 342 P.3d 243, 249–50 (Utah 2014); *see also Ezel v. Cockrell*, 902 S.W.2d 394, 399 & n.5 (Tenn. 1995) (listing jurisdictions that retained the doctrine as of 1995). However, the Utah court noted it "did not adopt the public duty doctrine until several years *after* the legislature first limited Utah's sovereign immunity," so "abrogation of absolute sovereign immunity could not impliedly extinguish a doctrine not yet recognized." *Cope*, 342 P.3d at 249–50 (emphasis added). Iowa's history is clearly different because we recognized and applied the public-duty doctrine well before the ITCA. *See, e.g.*, *Genkinger v. Jefferson County*, 250 Iowa 118, 120, 93 N.W.2d 130, 132 (1958); *Beeks v. Dickinson County*, 131 Iowa 244, 248, 108 N.W. 311, 312 (1906); *Held*, 58 Iowa at 144, 12 N.W. at 228–29. Connecticut, which also maintains the public-duty doctrine, does so because "Connecticut has not abolished governmental immunity." *Gordon v. Bridgeport Hous. Auth.*, 544 A.2d 1185, 1197 (Conn. 1988). Although these are only two examples, they illustrate that we should not "choose a rule merely because a majority" of other jurisdictions follow a similar one. *Luana Sav. Bank v. Pro-Build Holdings, Inc.*, 856 N.W.2d 892, 902 (Iowa 2014) (Wiggins, J., dissenting).

The state "is liable for tortious commissions and omissions when authority and control over a particular activity has been delegated to it . . . and breach of that duty involves a foreseeable risk of injury to an identifiable class to which the victim belongs." *Wilson*, 282 N.W.2d at 671. We have said the public-duty doctrine does not foreclose a claim when the identifiable class of people to which the state (or a municipality or county) owed a duty was "occupants of multi-family dwellings and other specified structures" in Des Moines, *id.* at 672, "all those rightfully using the roads" in Lee County, *Harryman v. Hayles*, 257 N.W.2d 631, 638 (Iowa 1977), *overruled on other grounds by Miller v. Boone Cty. Hosp.*, 394 N.W.2d 776, 781 (Iowa 1986), and "the traveling public" in Scott County, *Symmonds v. Chi., Milwaukee, St. Paul & Pac. R.R.*, 242 N.W.2d 262, 265 (Iowa 1976). We have also declined to apply the doctrine to claims when the class of persons exposed to a risk created by governmental actors is clearly limited. *See Summy v. City of Des Moines*, 708 N.W.2d 333, 344 (Iowa 2006) (invitees on a municipal golf course); *Adam v. State*, 380 N.W.2d 716, 723 (Iowa 1986) ("producers doing business with grain dealers"). In short, the public-duty doctrine is an anachronistic common law framework that we often avoid—and we should finally cut bait and abandon it altogether. *Cf. Kent v. City of Columbia Falls*, 350 P.3d 9, 21 (Mont. 2015) (Cotter, J., concurring) (suggesting the public-duty doctrine may no longer be viable in Montana and asserting the courts in that state have "erred in expansively reviving [governmental] immunity by resort to a judicially-created theory"). I would disavow *Kolbe* and *Raas* to the extent they perpetuate the public-duty doctrine.

But even if a majority of this court is not yet prepared to abandon the doctrine completely, we should not apply it in this case. In *Kolbe*, the

plaintiff asserted the state negligently issued a driver's license to a sight-impaired driver, but we concluded "the licensing provisions in Iowa Code chapter 321 . . . are for the benefit of the public at large" and therefore applied the public-duty doctrine. *Kolbe*, 625 N.W.2d at 729. The facts here are distinguishable. We are not dealing with a general licensing statute or a broad duty of care owed by the State to members of the general public from Larchwood to Keokuk, Hamburg to New Albin, and everywhere in between. Instead, the duty I would recognize in this case is one the State owed only to the boaters on Storm Lake who were exposed to a risk of serious injury or death from the submerged dredge pipe. Unlike the rather inchoate and generalized risk to any motorist or pedestrian traversing an unspecified roadway that could be literally anywhere in *Kolbe*, the risk allegedly created by the State and its dredging agents endangered a limited universe of people at a specific location. This very specific risk of serious injury or death affirmatively created by the State and its agents in a dredging enterprise undertaken for the benefit of the State makes this case more like *Harryman* and *Symmonds* than *Kolbe*. In fact, the number of boaters exposed to the risk in this case is probably smaller than the number of motorists exposed to road hazards in *Harryman* and *Symmonds*—cases in which we concluded the public-duty doctrine did not apply because the class of persons exposed to the risk of physical injury was sufficiently limited and identifiable. *See Wilson*, 282 N.W.2d at 672. And in this case—unlike in *Harryman* and *Symmonds*—the risk was created by the affirmative acts of actors whose conduct the State could control by prescribing terms for the dredging activity. That differentiates this case from, for example, a hypothetical scenario involving the State's failure to remove a naturally occurring hazard—like a ball of tree roots—from a waterway. *See State*

*ex rel. Barthelette v. Sanders*, 756 S.W.2d 536, 537–38 (Mo. 1988) (en banc).

The factually analogous cases from other jurisdictions that the majority cites are less persuasive in my view. The Washington case applied the public-duty doctrine only to a third-party beneficiary claim based on statutory violations, saying nothing about common law negligence claims. *Ravenscroft v. Wash. Water Power Co.*, 969 P.2d 75, 84–85 (Wash. 1998) (en banc). As one Washington Supreme Court justice later clarified, "the only governmental duties . . . limited by application of the public duty doctrine are duties imposed by a statute, ordinance, or regulation" and the Washington Supreme Court "has never held that a government did not have a *common law* duty solely because of the public duty doctrine." *Munich v. Skagit Emergency Commc'n Ctr.*, 288 P.3d 328, 336 (Wash. 2012) (Chambers, J., concurring) (emphasis added). Furthermore, I posit that the Missouri cases applying the public-duty doctrine are no longer good law because they predated the Missouri Supreme Court's 2008 decision abandoning the public-duty doctrine for government entities. *Compare Barthelette*, 756 S.W.2d at 538–39, *and Cox v. Dep't of Nat. Res.*, 699 S.W.2d 443, 449 (Mo. Ct. App. 1985), *with Southers v. City of Farmington*, 263 S.W.3d 603, 613 (Mo. 2008). Although the *Southers* court concluded an *individual* defendant was "eligible for the protections of the public duty doctrine," it noted those protections were "personal . . . and [could not] be extended to protect the City." *Southers*, 263 S.W.3d at 620.

There is yet another reason to review the public-duty doctrine thoroughly and ultimately discard it or at least continue to apply it narrowly. Our previous decisions applying the doctrine were based on provisions in the Restatement (Second) of Torts. *See Kolbe*, 625 N.W.2d

at 729. Yet, as the majority recognizes, in 2009—after *Raas* declared the public-duty doctrine alive and well, *see Raas*, 729 N.W.2d at 449—we adopted the duty framework under the Restatement (Third) of Torts: Liability for Physical and Emotional Harm. *Thompson v. Kaczinski*, 774 N.W.2d 829, 835 (Iowa 2009). *Thompson* revealed a new understanding of the duty framework, removing foreseeability from the duty analysis and expressing disinclination toward no-duty rules except in rare circumstances. I do not suggest no-duty rules are completely incompatible with the Restatement (Third). Indeed, as the majority observes, the Restatement (Third) includes references to the public-duty doctrine in certain comments. Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 7 reporter's note cmt. *g*, at 93–94 (Am. Law Inst. 2012) [hereinafter Restatement (Third)]; *id.* § 37 cmt. *i*, at 7. Yet, those references to the doctrine in the Restatement (Third) comments and reporter's notes[9] do not justify its muscular application favored by the majority opinion in this case.

---

[9]The majority relies on the reporter's note to conclude the public-duty doctrine perseveres under section 7 of the Restatement (Third) and undercuts the general duty of care. But the reporter's note merely collects cases applying the doctrine, and the cases obviously predate the Restatement (Third)—so the reporter's note takes no position on the doctrine's continuing vitality under section 7. Restatement (Third) § 7 reporter's note cmt. *g*, at 93–94. In fact, the actual comments—not the reporter's notes—for section 7 suggest the no-duty rule inherent in the public-duty doctrine might be folded into the concept of discretionary-function immunity. *See id.* § 7 cmt. *g*, at 80 ("Courts employ no-duty rules to defer to discretionary decisions made by officials . . . ."). The reporter's note, standing alone, is not nearly as significant as the majority suggests. Rather than maintaining the public-duty doctrine as part of the general duty of care under section 7, I conclude the Restatement (Third) instead relegates the doctrine to the status of a rare exception contemplated—but certainly not mandated—by section 37, consistent with the Restatement (Third)'s general disinclination toward no-duty rules. *See id.* § 7 cmt. *a*, at 78 (noting no-duty rules are only appropriate in limited circumstances); *id.* § 37 cmt. *i*, at 7 (acknowledging that the public-duty doctrine reflects "the concern that the judicial branch give appropriate deference to a coordinate branch of government when a decision allocates resources or involves other significant political, social, or economic determinations"). And even then, a court may determine an actor owes an affirmative duty of care notwithstanding section 37. *Id.* § 37, at 2.

As the majority notes, the Restatement (Third) provides that "[a]n actor whose conduct has not created a risk of physical harm to another has no duty of care to the other unless a court determines" the actor owes an affirmative duty of care. Restatement (Third) § 37, at 2. Sections 38–44 set forth affirmative duties a court might determine the actor owes. *See id.* §§ 38–44. The affirmative duties recognized in those sections, however, are nonexclusive. *See id.* § 37 cmt. *g*, at 7 (noting the sections "recognizing certain relationships as imposing an affirmative duty are stated nonexclusively, leaving to courts whether to recognize additional relationships as sufficient to impose an affirmative duty").

Even when the legislature has not created a private cause of action for violation of a statute, when the interest protected is physical harm, "courts may consider the legislative purpose and the values reflected in the statute to decide that the purpose and values justify adopting a duty that the common law had not previously recognized." *Id.* § 38 cmt. *c*, at 22. Although I share the majority's conclusion that the dredging provisions in chapter 461A do not create a private cause of action standing alone, I conclude the State's ability to control the terms of removal of silt from the lakebed through the permitting process, *see* Iowa Code § 461A.53, is relevant to the existence of an affirmative common law duty. Dredging structures in the water pose a risk of severe physical injury or death to boaters—as this case tragically illustrates—and I conclude the State's involvement in creating such a risk justifies our recognition of an affirmative duty in this case. Even though the State's employees did not directly create a risk by placing the dredge pipe in the location where Foote encountered it and did not place the buoys marking the pipe's location on the date of the incident, I nonetheless conclude the State had an affirmative duty of care to the plaintiffs under the

circumstances presented here. The State had statutory authority to prescribe the terms of the dredging operation. This authority would permit the State to mandate safety standards for locating the dredging equipment and warning of its presence. Given its ownership of the lakebed, the State also had the authority to inspect the dredge operation and evaluate the operator's compliance with the prescribed standards to make the lake reasonably safe for visitors.[10]

The relationship between boaters and the State informs my conclusion that the State owed an affirmative duty. Like the golfer in *Summy*, who the City of Des Moines invited to engage in recreational activity at the Waveland Golf Course, the State invited Foote to use his boat on Storm Lake. *See Summy*, 708 N.W.2d at 341. Although Foote did not pay a separate fee on the day of the incident for the opportunity to use the boat on Storm Lake, he did pay a fee to register his boat as a cost of using the State's waters. I find unpersuasive and immaterial the majority's factual distinction that other golfers on the course in *Summy* could not move about freely the way boaters on Storm Lake can.

My conclusion the State owed a duty does not automatically mean it breached the duty; duty and breach analysis are separate. *See Woods v. Dist. of Columbia*, 63 A.3d 551, 561 (D.C. 2013) (Oberly, J., concurring in the judgment) (asserting that even if courts discard the public-duty doctrine, "[t]he citizen might not 'win' because [he or] she still must prove the basic elements of a cause of action"). However, because I conclude the public-duty doctrine is no longer viable, and even if it is, the State

___

[10]I would hold the State's duty as the lakebed's owner to keep the premises in a reasonably safe condition "is a nondelegable duty." *Kragel v. Wal-Mart Stores, Inc.*, 537 N.W.2d 699, 703 (Iowa 1995). Although the State could cede *performance* of that duty to the Lakeside Improvement Commission, it cannot avoid liability for nonperformance by doing so. *See id.* at 704.

owed a duty in this case to an identifiably narrow group of people, a jury should resolve the question whether the State failed to exercise reasonable care. Summary judgment on the public-duty doctrine ground was unwarranted.

## II. Discretionary-Function Immunity.

The majority does not reach this issue, but I would hold the discretionary-function exception to the waiver of sovereign immunity does not apply here. Discretionary-function immunity only protects governmental actors' decision-making based on policy considerations. *See Anderson v. State*, 692 N.W.2d 360, 364 (Iowa 2005); *accord Walker v. State*, 801 N.W.2d 548, 555 (Iowa 2011). Furthermore, "we narrowly construe the discretionary function exception." *Walker*, 801 N.W.2d at 555. "[L]iability . . . is the rule and immunity is the exception." *Schmitz v. City of Dubuque*, 682 N.W.2d 70, 74 (Iowa 2004); *accord Graber v. City of Ankeny*, 656 N.W.2d 157, 161 (Iowa 2003).

We apply a two-step test to evaluate whether a challenged act qualifies for the discretionary-function exception. *Schneider v. State*, 789 N.W.2d 138, 146 (Iowa 2010). First, we "consider whether the action is a matter of choice." *Anderson*, 692 N.W.2d at 364. If it is, we proceed to determine whether that choice "is of the kind the discretionary function exception was designed to shield." *Id.*; *see also Berkovitz v. United States*, 486 U.S. 531, 536, 108 S. Ct. 1954, 1958–59, 100 L. Ed. 2d 531, 540–41 (1988) (setting out the same two-part test under the Federal Tort Claims Act); *Goodman v. City of Le Claire*, 587 N.W.2d 232, 238 (Iowa 1998) (adopting *Berkovitz* in Iowa). Both prongs of the test are important; "the mere exercise of judgment is not sufficient to establish discretionary-function immunity because some form of judgment is exercised in virtually all human endeavors." *Schmitz*, 682 N.W.2d at 73.

"The first step in our analysis is to determine the exact conduct that is at issue." *Walker*, 801 N.W.2d at 556. To be sure, the State made a choice in this case, but it was a limited one—to allow improvement of Storm Lake by dredging. Thus, the immunity might apply if the estate challenged the State's decision *whether* to allow dredging. *See Anderson*, 692 N.W.2d at 366 (concluding the discretionary-function exception applied to a university's decision whether to keep its library open during a severe winter storm); *Goodman*, 587 N.W.2d at 239–40 (concluding the discretionary-function exception applied to a city's decision whether to excavate an abandoned landfill); *cf. MS Tabea Schiffahrtsgesellschaft MBH & Co. v. Bd. of Comm'rs*, 636 F.3d 161, 168 (5th Cir. 2011) (concluding the federal discretionary-function exception barred "failure to dredge claims"). But the estate makes no such claim. Instead, it contends that, having made the initial decision to allow dredging, it was the State's duty, in view of the severe risk of injury or death to boaters using the lake, to exercise reasonable care in prescribing safety standards to be followed by the dredge operators and evaluating the operators' compliance with those standards. I agree. The actionable conduct is not the initial decision whether to allow dredging, but the follow-on decisions about safe maintenance and operation of the dredge.

"Having identified the conduct that allegedly caused the plaintiffs' harm, the question becomes whether the conduct is of the type that the legislature sought to immunize." *Ette v. Linn-Mar Cmty. Sch. Dist.*, 656 N.W.2d 62, 68 (Iowa 2002). Unless the State "genuinely could have considered and balanced factors supported by social, economic, or political policies, we will not recognize the discretionary function immunity." *Anderson*, 692 N.W.2d at 366. The State contends its decisions rested on a balancing of public policy factors such as safety,

conservation, and water quality. However, "[t]he mere existence of a sweeping safety consideration does not catapult the [State]'s actions into the zone of immunity." *Graber*, 656 N.W.2d at 166. "Almost every decision made by a public employee is done with respect to general safety considerations." *Id.* Furthermore, while the initial decision to allow dredging may have properly considered some environmental factors, I find it much less likely that the number or location of warning buoys placed on the dredge pipe could have had any appreciable effect on water quality or conservation efforts. Because the State "has not articulated any . . . policy concerns central to its actions, it has not met its burden to show the discretionary function immunity applies." *Messerschmidt v. City of Sioux City*, 654 N.W.2d 879, 883 (Iowa 2002).

### III. Conclusion.

The majority expands the public-duty doctrine "far more broadly than is necessary to strike the proper balance between protecting the [State] from sweeping liability . . . and allowing [its] citizens the chance to prove that their government has failed them miserably." *Woods*, 63 A.3d at 558. Even if we retain the doctrine—and I submit we should not—its application is inappropriate under the circumstances presented here. Furthermore, I believe the discretionary-function exception does not protect the State beyond its initial decision whether to allow dredging. I therefore respectfully dissent in part.

Wiggins and Appel, JJ., join this concurrence in part and dissent in part.